906 A.2d 915 (2006)
394 Md. 439
In re KAELA C., Gunner C. and Franklin C.
No. 63, September Term, 2005.
Court of Appeals of Maryland.
September 8, 2006.
*916 Brian L. Zavin, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioners.
C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondents.
Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.
BATTAGLIA, J.
Petitioner, Leslie C., seeks review of the Court of Special Appeals's judgment affirming *917 the Circuit Court of Frederick County's order in which it adopted the recommendations and findings of a master prior to the expiration of the five-day period to file exceptions afforded by Maryland Rule 11-111(c). We granted certiorari in this case to answer the following questions:
1. Did the juvenile court err in entering an immediate order dismissing the CINA petitions without affording Petitioner an advance opportunity to file exceptions to the master's findings and recommendations?
2. Did the juvenile court deprive Petitioner of her right to due process of law by dismissing the CINA petitions without affording her an advance opportunity to file exceptions to the master's finding and recommendations?
3. Did the Court of Special Appeals err in applying its decision to Petitioner, who could not have known of the basis for that court's decision prior to appeal?
In re: Kaela C., 388 Md. 673, 882 A.2d 286 (2005). After the filing of briefs and oral argument, we issued an order requesting supplemental briefs and scheduling further proceedings on an additional issue:
What is the effect, if any, on the pending appeal before this Court of the judicial proceedings that have been instituted in the State of California?
We shall hold that the issues presented in Mrs. C.'s petition for a writ of certiorari are not moot because Mrs. C. continues to suffer collateral consequences from the circuit court's order transferring custody of the children to Mr. C. and that the circuit court erred in adopting the master's recommendations prior to the expiration of the five days for filing of exceptions provided by Maryland Rule 11-111(c).[1]

I. Background
Petitioner, Leslie C. (Mrs. C.), and Christopher C. (Mr. C.) are the biological parents of Kaela C., Gunner C., and Franklin C. Mr. and Mrs. C. were divorced in August, 2001, and Mrs. C. was awarded legal and physical custody of the children. On December 2, 2003, in response to allegations of abuse, the Frederick County Department of Social Services ("DSS") removed all three children from Mrs. C.'s care, placed them in emergency shelter care[2] pursuant to its authority under Section 3-815(b) of the Courts and Judicial Proceedings Article,[3] and subsequently *918 filed a petition with the Circuit Court for Frederick County seeking continued shelter care pursuant to Section 3-815(c) of the Courts and Judicial Proceedings Article,[4] and a determination that the children were children in need of assistance (CINA).[5] Maryland Code (1973, 2002 Repl. Vol.), § 3-815(b) of the Courts and Judicial Proceedings Article. Both parents appeared before the circuit court, sitting as a juvenile court, for the shelter care hearing on December 8, 2003, and, while not admitting the allegations contained in the petition, agreed to the need for continued shelter care. Pursuant to Section 3-807(d)(3) of the Courts and Judicial Proceedings,[6] the master recommended that the children be placed in licensed foster care pending an adjudicatory hearing,[7] that Mr. C. be granted extended, unsupervised visitation, that Mrs. C. be granted supervised visitation, and that an updated family psychological evaluation be performed, and the trial judge immediately adopted those recommendations in the form of an order.
The master held an adjudicatory hearing on March 3, 2004, at which Mrs. C., Mr. C., and the DSS all appeared with counsel, in addition to counsel for the children. Because the court-ordered family assessment had not been completed, the DSS requested that the disposition hearing[8] be postponed. Before addressing DSS's request, the master asked whether the parties had reached an agreement as to the facts alleged in the CINA petition:
COUNSEL FOR MRS. C.: Ah, we're not gonna contest the petition, Your Honor. We have some additional facts and information we want to proffer for the court by way of explanation. But *919 we're not admitting or denying the allegations.
THE MASTER: Okay. And [Counsel for Mr. C.]?
COUNSEL FOR MR. C.: Your Honor, we are going to argue Courts and Judicial Proceedings 3-819(d), 
THE MASTER: Russell G.[9]
COUNSEL FOR MR. C.: Yeah. Exactly.
THE MASTER: And what about the allegations contained in the petition? What's mom's 
* * *
 I mean dad's position on that?
COUNSEL FOR MR. C.: There is only one paragraph that applies to my client. It's on, by, it's on page five and it's letter O and it basically says that my client cannot provide appropriate care for the three children due to his military obligations and frequent long absences and we don't agree with that. We think that my client is able and willing to provide care for the children.
* * *
THE MASTER: Okay. [Counsel for the Children]?
COUNSEL FOR THE CHILDREN: Thank you, Your Honor. That came as a surprise to me. If that's the case, Your Honor, I, I think dad should be available for cross examination if he, he's going to 
Acknowledging that there was confusion among the parties, the master called a recess and asked the parties into her office to clarify the position of each regarding the CINA allegations and thereafter, on the record, summarized the state of the proceedings:
THE MASTER: I believe in this matter, and counsel let me know if there's any disagreement, mother and father are proceeding by an Alford type plea where they neither admit nor deny the allegations contained in the petition. However, they agree that those allegations, those same allegations would be the allegations presented by the [DSS] at a full adjudicatory hearing and that the court would find those allegations to be true or sustained by a preponderance of the evidence and that they would support a finding that the children are children in need of . . . well, actually, we're not gonna go that far to the CINA, to the CINA part. Basically that the allegations would be true and thereafter that, that disposition would be continued for a time that will be further argued in open court. Is that your understanding, [Counsel for DSS]?
COUNSEL FOR DSS: Yes, Your Honor. That's what the [DSS] understood.
THE MASTER: And is that your understanding, [Counsel for Mrs. C.]?
COUNSEL FOR MRS. C.: Yes, Your Honor, and I just have a few facts I want to, some information I want to give the court.
THE MASTER: Okay. And is that your understanding, [Counsel for MR. C.]?
COUNSEL FOR MR. C.: Yes, Your Honor.
THE MASTER: And is that your understanding, [Counsel for the Children]? And actually, the children have agreed to stipulate to the 
COUNSEL FOR THE CHILDREN: That's correct 
THE MASTER:  allegations.
COUNSEL FOR THE CHILDREN: That's correct. 
* * *

*920 THE MASTER: Okay. In, in this matter I will, in the, in the matter of the C. children I'll note for the record that the social worker, mother and father are present, as are [DSS]'s attorney, mom's attorney, dad's attorney, and the children's attorney. I will note that the [DSS] and the children stipulated to the allegations contained in the petition and agreed that they were sufficient to determine that the children are children in need of assistance. I also will note that mother and father neither admitted nor denied the allegations contained in the petition. However, they did agree that those same allegations would be the allegations presented by the [DSS] at a full adjudicatory hearing and, and that those allegations would be proven by a preponderance of the evidence and support a finding that the children are children in need of assistance. Thereafter, based on that I will find that the allegations contained in the petition are true and sustained.
The circuit court subsequently adopted the master's recommendations and issued an Order, within two days, finding that,
the child and the [DSS] stipulated to the allegations contained in the [DSS]'s Petition, and mother and father neither admitted nor denied the allegations contained in the Petition; however, they agreed that had there been a full adjudicatory hearing in this matter, those same allegations would have been the allegations presented by the [DSS], and those same allegations would have been proven by a preponderance of the evidence and otherwise support a finding that the children are Children in Need of Assistance, and . . . the Circuit Court for Frederick County, Maryland . . . finds that the following facts as alleged in the petition are true and are sufficient to find that the children need or require the court's intervention.
The court ordered the children to remain in licensed foster care and scheduled the disposition hearing for March 17, 2004.[10]
During the disposition hearing, Mr. C. requested, pursuant to Maryland Code (1973, 2002 Repl.Vol.), § 3-819(e) of the Courts and Judicial Proceedings Article,[11] that the CINA petition be dismissed and that custody of the children be transferred to him. He argued that the CINA petition did not allege that he had ever abused or neglected the children, but that he had been unable to take care of the children because of his enlistment in the United States Navy. Mr. C. contended that the ship that he was stationed on, the U.S.S. Ronald Reagan, was currently berthed in Virginia, but was being transferred to San Diego, California, where he was in the process of purchasing a house, and that once his ship was transferred, he would apply for, and be granted, shore duty to enable him to properly care for the children. Mr. C. maintained that, if he was granted custody that day, he would be permitted to travel by air with the children. Mrs. C. opposed Mr. C.'s request *921 on the basis that Mr. C.'s plans were conjectural and requested that the children remain in foster care so that she could continue working toward reunification with them. The master postponed ruling on these requests in order to give Mr. C. and his fiancee the opportunity to submit to psychological evaluations, to have Mr. C.'s fiancee undergo a background check, to allow Mr. C. to obtain documentation from the Navy affirming that he would be granted shore duty in California, and to give Mr. C. the opportunity to negotiate visitation arrangements with Mrs. C.
On April 21, 2004, the parties appeared before the master for the conclusion of the disposition hearing at which time each of the parties was heard:
COUNSEL FOR DSS: The, we felt that it was appropriate for the court to dismiss the CINA and place the child with the father. The court declined to do that and continued the dispositionary hearing until today and suggested or ordered that a number of things occur. Some of those things I can report to the court have occurred. One is the addendum to the C. family assessment. I believe it's been filed with the court in each of these cases.
* * *
COUNSEL FOR DSS: We do believe that the case has been made against, not, I hate to use the word against, but in regard to Mrs. C. And therefore the court is required to apply Courts and Judicial, Section 3-819(e) and dismiss the CINA petition and provide, and provide custody to father. And we would ask the court to do that today. And I would, I would add that the, I'm sure that somewhere in the record the, the children really want to be with their father and it's really causing problems in keeping them in foster care. One child is probably gonna be removed today if, if not returned because of the behavior, and I think the [DSS]'s position is that that is directly attributable, I think it's his?
COUNSEL FOR THE CHILDREN: Yes.
COUNSEL FOR DSS: Working with that case. His desire to be returned home or to be returned to his father.
THE MASTER: Okay. [Counsel for Mrs. C.].
COUNSEL FOR MRS. C.: Ah, yes, Your Honor. With respect to the [DSS]'s request, Your Honor, I think that's precluded already by the court's order of March 3rd. The, all parties agreed that the facts in the petition supported a finding of the children that were in need of assistance and that was agreed to on the record and signed by the Master and signed by [the trial judge] on March 5th. So there's no way that the section cited by the [DSS] is, is applicable at this point. Barring the judge reversing this order. But, so the children, the facts had been agreed to by the parties sufficient to support a finding of CINA against both parents. So Russell G. no longer applies. Your Honor, the father, again, I've subpoenaed the father. I've requested that the subpoena be continued to this hearing. That he produce evidence of shore duty of his, any assignment other than to the U.S.S. Ronald Reagan. It is, I have not received any documentation to that effect. He's still, he's still single. He's not married. And he is, has shore duty until September of 2005. He's not, it's not possible for him to have these children. He has apparently intentions to marry somebody although that's not mentioned in Dr. Weaver's[[12]] report. *922 The word marriage was not mentioned in that entire report or the addendum, to this Ms. O'Reilly. And her extended family is in Oakland which is 12 hours from San Diego and she's full-time Navy going to school full-time and she's intending to take care of these children. Highly unrealistic. I think Dr. Weaver must have been, I don't know what she was thinking, but the word marriage was not mentioned. Mr. C.'s either gonna do this on his own or he's not gonna do it at all. He may have some help here and there but I don't think this court can rely on an engagement of some young lady that is in the Navy full-time and subject to call to go to Iraq or wherever, going to school full-time as an aviation maintenance. Ah, it's all very nice, but I don't think this court can rely on that for giving him custody. He's subject to the Family Care Regulations of the U.S. Navy which require him to designate someone to take care of the children should he be called up. He has as we know ship duty and feeling the world situation he could be called up at any minute. He hasn't designated anybody contrary to Navy regulations for these children. And we've subpoenaed that. We've asked him to produce it. He hasn't and so he has no plan for these children, Your Honor. He's still stationed in Virginia and he's in the process of buying a house in California, San Diego area with the prospect of the U.S.S. Ronald Reagan will ship out and go where her, via whatever, the Panama Canal to, to California and that he will be then stationed on ship duty in California. But that is yet to be produced and he's apparently relayed some of these plans to Dr. Weaver.
Your Honor, my client has entered into therapy with Dr. Rinehart. She's visited regularly with the children. She is doing everything she can to get her life together. She's going to school online full-time at home. And she submitted a rebuttal to Dr. Weaver's initial report detailing the mistakes that Dr. Weaver made in that. She's working with her church and she wants to have an opportunity to reunite with these children, Your Honor, and I don't see how this court could release these children to such an uncertain speculative arrangement.
The master also heard from Mr. C.'s counsel, who again requested that custody be transferred to him, pursuant to Maryland Code (1973, 2002 Repl.Vol.), § 3-819(e) of the Courts and Judicial Proceedings Article, because Dr. Weaver's family assessment concluded that placement with Mr. C. would be in the children's best interests. The children's counsel agreed:
[COUNSEL FOR THE CHILDREN]: If one refers to Dr. Weaver's first report, Your Honor, she even interviewed dad and dad's fiancee, she was pretty clear. She was really unequivocal even at that time and she does refer to Gunner's behavior. Emotionally regressed, developmentally delayed, severe behavioral problems. I can tell you almost first hand that his behavior has deteriorated in the past week. He is in the foster home of the daughter to Judy, my assistant, (inaudible), and she's on the phone about three times a day now. It's, it's deadly serious. It really is serious. This little boy seems to have for some reason no respect for women and he does have respect for men. I'm hearing this from the foster parents and I'm relating it to the dad. I utterly, totally, Your Honor, support the [DSS]. What concerns me, and there's been allusions to it just now and it, it's taken all I can do to stop this happening, and that is the foster mother calling and DSS and saying this is too much to deal with. We're talking about things like this little boy undoing a safety belt while he's *923 sitting in a vehicle. He now has a special bus to take him to school because the bus driver just won't put up with the behavior of this kid in the bus anymore. He, it's beyond what a foster parent should have to put up with. And I don't want him, Your Honor. I go there quite often and it's a great place if there's nowhere else to go, but we've got a dad and from what I, I had a conversation with him outside and I, I think he's got it together, Your Honor, that he will put, and I've been very serious with him about what he's looking forward to and, and Dr. Weaver addresses that as well. Dad has got to be looking at ongoing therapy. But he comes out quite favorable in the, in the addendum to the report as does his fiancee. They do seem like responsible people. These kids, Your Honor, need to go home. They need to go to their father where, is the place that Dr. Weaver recommended and, ah, and dad's got this house. It looks like it's (inaudible). And if he has to go back on a ship at some point there's got to be something that I imagine the Navy will help him put in place in the way of day care. This little boy needs some stability and foster care is not for him. I'm asking you to put the children in their father's care, Your Honor.
Having heard all of the parties, the master reported her findings and recommendations:
THE MASTER: In this situation I've had the opportunity to review all of the exhibits that have been submitted. I think this is a very difficult situation for everybody involved. I'm certain of that. Dr. Weaver's assessments generally recommend that the placement of the children be with their father and suggests that Mr. C. is available to care for the children. The Paragraph O in the [DSS]'s report says that, the language is that father is currently unavailable. Now currently is at the time the petition was filed or current, is currently unable to provide appropriate care for the children due to his military obligations and frequent long absences. Now today at disposition we're presented with information that father is available to care for the children and we also have the suggestion or the recommendation on the part of dad and related concurrent to the child, I'm not giving a whole lot of weight to dad's request because it's sort of self-serving and, but that, that the children be placed with dad and I think that there has been credible evidence presented this afternoon that supports a placement of the children with dad.
So in this matter as to disposition I will find as follows. Based on the information that has been received subsequent to the adjudicatory hearing, I find that father, Christopher C., is available and is able and willing to care for the children. I find that Dr. Weaver has recommended the placement of the children with father and therefore pursuant to 3-819(e) of the Courts and Judicial Proceedings, I believe that it is appropriate to find that the allegations in the [DSS]'s petition are really only sustained against mother and I think pursuant to that, based on all the information I am required to dismiss the petition. However, before dismissing the petition I will adopt the [DSS]'s recommendation that . . . Mr. C. be awarded physical and legal custody of the children. Mr. C. and his fiancee and the children participate in family therapy as soon as possible, immediately after relocation in California. That the children participate in individual therapy immediately after their relocation. That a further visitation schedule be established. That mother enjoy reasonable and liberal visitation with the children. That Mrs. C. participate in individual therapy and *924 that Mr. C. seek special academic services for Gunner immediately, and I will dismiss the petition and I will prepare a report and recommendation as quickly as I can.
COUNSEL FOR MR. C.: Your Honor?
THE MASTER: Yes.
COUNSEL FOR MR. C.: I think you misspoke a little bit. You said 3-819(e). Um, I think you meant 3-819(d) because that's the one that we went under.
THE MASTER: D?
COUNSEL FOR MR. C.: Yes, Your Honor. Because (e) talks about in the disposition remove a child from the child's home.
COUNSEL FOR MRS. C.: Your Honor, I just wanted to inform the court and all parties that we plan to take an exception to the court's ruling so that placement of the children should not be changed until 
THE MASTER: Hold 
COUNSEL FOR MRS. C.:  final court orders 
THE MASTER:  hold, hold on. Let me finish this. It's 3-819(e), [Counsel for Mr. C.].
COUNSEL FOR MR. C.: E, Your Honor?
THE MASTER: Yeah, you can look it up. That's the, I'm relying on the Russell G. 
COUNSEL FOR MR. C.: Oh, okay 
THE MASTER:  situation 
COUNSEL FOR MR. C.:  that's fine.
THE MASTER: [Counsel for Mrs. C.], your comments are noted for the record. Thank you very much.
COUNSEL FOR MR. C.: Okay.
THE MASTER: I'll inform the court and what happens from here I don't have a whole lot of control over.
COUNSEL FOR DSS: Your Honor, can we request that the court's order, I forget the exact language and I know it's questionable whether it can be done, but that the court's order become an immediate order pending the exceptions hearing.
THE MASTER: Actually I think I can do that.
COUNSEL FOR MRS. C.: I, I would object to that, Your Honor.
THE MASTER: Okay. [Counsel for Mr. C.], [Counsel for the children], do you wish to be heard?
COUNSEL FOR MR. C.: Ah, we support the [DSS]'s position, Your Honor.
COUNSEL FOR THE CHILDREN: As do I, Your Honor.
THE MASTER: I will recommend in light of the imminent necessity to remove Gunner from his home, pursuant  and pursuant to Maryland Rule 9-208(h)(2) as well as the CINA provision of Courts and Judicial Proceedings which indicate that when the placement of the child is changed, the Master can recommend the, ah, can recommend that the court adopt that recommendation immediately. I will also recommend that my . . . that the recommendations be adopted immediately. But certainly counsel would be entitled to a hearing on that and that will conclude these matters.
Two days later the circuit court adopted the master's recommendations, which had been submitted in writing, and issued the following Order:
FOUND, that father, Christopher C., is available, willing and able to care for the children; and
FOUND, that Dr. Weaver has recommended the placement of the children with their father; and
FOUND, that the children are not children in need of assistance for the following reasons: The children's father is available, able and willing to care for the children; and

*925 FOUND, that the children have poorly adjusted in their placements in foster care and it is in their best interests to be placed with their father immediately; and
FOUND, that Gunner's current foster care placement is jeopardized due to his poor behavior and his immediate placement with his father is in his best interests; and
FOUND, that extraordinary circumstances exist pursuant to Md. Rule 9-208(h)(2) that justify the entry of an immediate Order in light of the children's poor adjustment to foster care and the jeopardy of Gunner's currently placement.
The circuit court therefore ordered transfer of legal and physical custody of the children to Mr. C., who immediately took them to California.[13]
Immediately thereafter, Mrs. C. noted an appeal to the Court of Special Appeals contending that the circuit court deprived her of her right to file exceptions to the master's recommendations within five days as provided by Maryland Rule 11-111(c) by adopting the recommendations two days after the master entered her findings. The Court of Special Appeals, although noting that the circuit court had erroneously relied upon Maryland Rule 9-208(h)(2) to immediately adopt the master's recommendations, determined that the circuit court had the authority to do so under Maryland Rule 11-115(b)'s provision stating "a commitment recommended by a master . . . may be implemented in advance of court approval." In so holding, the Court of Special Appeals relied upon Section 3-801(h) of the Courts and Judicial Proceedings Article's definition of the word "commit" as "to transfer custody." Maryland Code (1974, 2002 Rep. Vol.), § 3-801(h) of the Courts and Judicial Proceedings Article. The Court of Special Appeals also held that the circuit court's immediate adoption of the master's recommendations did not preclude Mrs. C. from filing exceptions. Further, the intermediate appellate court determined that, based upon the master's statement on the record that her recommendations would be immediately effective pending the exceptions hearing, Mrs. C. could not claim that she was misled into believing that the court's immediate adoption of the recommendations precluded her from filing exceptions. Therefore, the Court of Special Appeals affirmed the judgment of the circuit court.
During the pendency of her appeal, Mrs. C. also filed an action for Registration of Out-of-State Custody Decree in the Superior Court of California, County of San Diego, pursuant to Section 3443 of the California Uniform Child Custody Jurisdiction and Enforcement Act.[14] On October *926 22, 2004, pursuant to California Code (1999), Section 3410 of the Family Code,[15] Judge Halgren of the Superior Court of California contacted the presiding judge in Frederick County, Maryland, and the judges agreed that the State of California would assume jurisdiction over the custody and visitation issues of the C. children, without prejudice to Mrs. C.'s pending appeal in Maryland. Judge Halgren thereafter conducted a custody hearing and issued an order stating:
The court has reviewed and considered the parenting plan submitted by Family Court Services. That report previously had been provided to the parties. The court also has consulted with Frederick County (Maryland) Circuit Court Judge. . ., the judge presiding in the matter of the [C. Children]. . . . Letters summarizing those consultations have been provided to the parties.
The court then iterated that California had jurisdiction over the custody and visitation issues for the C. children, and, having reviewed the parties' filings and heard oral arguments, awarded both legal and physical custody of the children to Mr. C. and granted supervised visitation of all the children to Mrs. C.
On April 23, 2005, during a supervised visit with the children, Kaela C. was injured during Mrs. C.'s attempt to intervene in a fight among the children. Another Superior Court Judge, Judge Kutzner of the California Superior Court issued a new visitation order on June 28, 2005, suspending Mrs. C.'s visitation rights, and stating:
This court has reviewed and considered the May 19, 2005 supplemental report submitted by Family Court Services, the May 18, 2005 letter submitted by Child Protective Services, the findings in the related case involving these parties by the Frederick County Circuit Court for the State of Maryland and the published decision on that case by the Maryland Court of Special Appeals, the filings in this court by the parties, and the arguments and testimony presented at the hearing.
Shortly after Mrs. C.'s visitation rights were suspended in California she petitioned this Court for a writ of certiorari.

II. Discussion

A. Mootness
The first issue we are called upon to resolve is whether the case at bar has been rendered moot by California's assumption of jurisdiction over the matters of custody and visitation with the C. children.
Mrs. C. contends that a case is moot when there no longer exists a controversy between the parties so that the court cannot provide an effective remedy. She argues that this case is not moot because the circuit court's April 23, 2004 order sustaining the CINA allegations against Mrs. C. and transferring custody of the children to Mr. C. continues to affect Mrs. C.'s custodial rights in California and that, were this Court to remand the case for further proceedings, she would be able to challenge the master's finding by filing exceptions in the circuit court. Mrs. C. points out that the fact that this controversy is still alive in Maryland is evidenced by the California court's recognition that its resolution of custodial and visitation issues should not prejudice the ongoing proceedings in the Maryland courts.
*927 Conversely, the DSS argues that this case is moot because the circuit court could not grant Mrs. C. any relief were we to remand this case for further proceedings. The DSS maintains that the California court has since granted Mr. C. custody through its own proceedings, and the propriety of the California court's orders cannot be reviewed by a Maryland court. Finally, the DSS maintains that the circuit court also should not endeavor to maintain concurrent jurisdiction with the California court because that would be contrary to the Uniform Child Custody Jurisdiction Act. Accordingly, the DSS argues that only the California courts can provide Mrs. C. proper relief.
A case is moot when there is no longer any existing controversy between the parties at the time that the case is before the court, or when the court can no longer fashion an effective remedy. Hammen v. Baltimore County Police Dept., 373 Md. 440, 449, 818 A.2d 1125, 1131 (2003); J.L. Matthews, Inc. v. Maryland-Nat'l Capital Park and Planning Comm'n, 368 Md. 71, 96, 792 A.2d 288, 302 (2002); In re Michael B., 345 Md. 232, 234, 691 A.2d 1309, 1310 (1997); Coburn v. Coburn, 342 Md. 244, 250, 674 A.2d 951, 954 (1996). Because we do not sit to give advisory opinions, we generally order that moot actions be dismissed without a decision on the merits. In re Rosa A. Riddlemoser, 317 Md. 496, 502, 506, 564 A.2d 812, 815 (1989). Where there might be some effects from the trial court's decision in a moot case we vacate the judgments below and order that the trial court dismiss the action. See, e.g., Hammen, 373 Md. at 457-58, 818 A.2d at 1135-36; Robinson v. Lee, 317 Md. 371, 380, 564 A.2d 395 (1989); State v. Peterson, 315 Md. 73, 82, 90, 553 A.2d 672, 677, 681 (1989); Attorney General v. Anne Arundel County School Bus Contractors Ass'n, 286 Md. 324, 330, 407 A.2d 749, 753 (1979). Where, however, it seems apparent that a party may suffer collateral consequences from a trial court's judgment, the case is not moot. Toler v. Motor Vehicle Admin., 373 Md. 214, 219, 817 A.2d 229, 232 (2003) (holding that issue of whether petitioner's driver's license was wrongly suspended was not moot, despite the fact that the suspension period had ended and his full driving privileges had been restored, because of potential collateral circumstances the initial suspension could cause); see also In the Matter of A.K., 360 N.C. 449, 628 S.E.2d 753 (2006) (holding that adjudication of petitioners' daughter as a neglected child was not moot even after full custody of the daughter was returned to the petitioners because of the collateral consequences the adjudication may have on the petitioners' credibility); Williams v. Ragaglia, 261 Conn. 219, 802 A.2d 778 (2002) (holding that judgment revoking petitioner's special foster care license was not moot regardless of the fact that petitioner was later granted full custody of the foster children because the judgment could have collateral consequences with regards to her future ability to be a foster parent); In re A.V., 176 Vt. 568, 844 A.2d 739, 741 (2003) (holding that question of whether child was in need of care and supervision ("CHINS") was not moot, despite the fact that the child was no longer within the statutory age parameters for being considered a CHINS, where the lack of parental supervision continued to have collateral consequences on child's ability to function in the world); In re Hatley, 291 N.C. 693, 231 S.E.2d 633, 634-35 (1977) (determining that issue of whether petitioner was wrongly involuntarily committed to a mental institution was not moot even though the commitment order had since expired because of the commitment's potential adverse collateral legal circumstances). Cf. In the Interest of I.S., 278 Ga. 859, 607 S.E.2d 546, 549 (2005) (holding that issue of whether trial court erroneously determined *928 children to be "deprived" was moot because the parents retained custody of the children and failed to show that they suffered any adverse collateral consequences resulting from the determination).
Whenever the courts of two or more states are embroiled in custody proceedings[16] the Uniform Child Custody Jurisdiction Act, or its successor, the Uniform Child Custody Jurisdiction Enforcement Act, is implicated. Thus, to determine whether the issues raised by Mrs. C. are moot, we first must explore the relevant provisions of these acts. The Uniform Child Custody Jurisdiction Act was promulgated by the National Conference of Commissioners On Uniform State Laws (NCCUSL) in 1968 to address both the increased mobility of individuals and the negative results of that mobility, namely the rampant kidnaping of children by parents looking to relitigate custody determinations in a more favorable forum, a tactic known as "seize and run." Unif. Child Custody Jurisdiction Act, 9 U.L.A. 262-65 (1999); Catherine F. Klein, Leslye E. Orloff, Hema Sarangapani, Border Crossings: Understanding the Civil, Criminal, and Immigration Implications for Battered Women Fleeing Across State Lines with Their Children, 39 Fam.L.Q. 109, 114-15 (2005); Christopher L. Blakesley, Child Custody-Jurisdiction and Procedure, 35 Emory L.J. 291, 293-97 (1986). The Act serves several purposes, specifically:
It limits custody jurisdiction to the states where the child has his home or where there are other strong contacts with the child and his family. . . . It provides for the recognition and enforcement of out-of-state custody decrees in many instances. . . . Jurisdiction to modify decrees of other states is limited by giving a jurisdictional preference to the prior court under certain conditions. . . . Access to a court may be denied to petitioners who have engaged in child snatching or similar practices. . . . Also, the Act opens up direct lines of communication between courts of different states to prevent jurisdictional conflict and bring about interstate judicial assistance in custody cases.
9 U.L.A. 111 (1979). By 1981 the Act had been adopted by all fifty states and the District of Columbia. UCCJEA, prefatory note 1. Maryland adopted the Uniform Child Custody Jurisdiction Act in 1975.1975 Md. Laws Ch. 265, § 2.
In 1997, NCCUSL promulgated the Uniform Child Custody Jurisdiction Enforcement Act, revisory of the earlier Act, to provide stronger guidelines for determining which state has original jurisdiction, continuing jurisdiction, and modification jurisdiction[17] over a child custody determination.[18] UCCJEA, prefatory note 1. California adopted the revised Uniform Child *929 Custody Jurisdiction Enforcement Act (the California UCCJEA) in 1999, making it applicable to the California proceedings in this case. 1999 Cal. Stat. Ch. 867. The revised Act was not adopted in Maryland until 2004, however, and is only applicable to cases filed to establish or modify child custody on or after October 1, 2004. 2004 Md. Laws Ch. 502. Because the case before us was initiated in Maryland in 2003, it falls under the guidelines of the original Maryland Uniform Child Custody Jurisdiction Act ("Maryland UCCJA").
Under Section 9-204 of the Maryland UCCJA, a court has jurisdiction to enter a custody determination by "initial decree"[19] or "modification decree"[20] if:
(1) this State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of the child's removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this State.
Maryland Code (1999), Section 9-204(a)(1) of the Family Law Article. "Home state" is defined as
the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as parent, for at least 6 consecutive months, and in the case of a child less than 6 months old, the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period.
Maryland Code (1999), Section 9-201(f) of the Family Law Article. When issuing a custody decree, however, basic tenets of due process first must be followed; namely, parties must be afforded notice and an opportunity to be heard, as set forth by Section 9-205 of the Maryland UCCJA:
Before making a decree under this subtitle, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated, and any person who has physical custody of the child. If any of these persons is outside this State, notice and opportunity to be heard shall be given pursuant to the Maryland Rules.
Maryland Code (1999), Section 9-205 of the Family Law Article (emphasis added).[21] The requirement of due process *930 also dictates whether the Maryland decree is binding on the parties, as Section 9-212 evidences:
A custody decree rendered by a court of this State which had jurisdiction under § 9-204 of this subtitle binds all parties who have been served in this State or notified in accordance with the Maryland Rules of Procedure, or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties, the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions of this subtitle.
Maryland Code (1999), Section 9-212 of the Family Law Article (emphasis added).[22]
These two Maryland provisions are almost identical to Sections 4[23] and 12[24] of the UCCJA, after which they were modeled. The comments to Section 4 of the UCCJEA reinforce the importance of adherence to the due process requirements of notice and an opportunity to be heard:
This section lists the persons who must be notified and given an opportunity to be heard to satisfy due process requirements.. . . Strict compliance with section[ ] 4 . . . is essential for the validity of a custody decree within the state and its recognition and enforcement in other states under sections 12, 13, and 15.
UCCJA, § 4 comment (emphasis added), as do the comments to Section 12:
This section deals with the intra-state validity of custody decrees which provides the basis for their interstate recognition and enforcement. The two prerequisites are (1) jurisdiction under section 3 of this Act and (2) strict compliance with due process mandates of notice and opportunity to be heard.

UCCJA, § 12 comment (emphasis added).
Assuming due process has been afforded all parties, once an initial custody decree has been issued by a Maryland court, parties may enroll that determination in a *931 sister state. In California, that enrollment is controlled by Section 3443 of the California UCCJEA, which provides in relevant part:
(a) A court of this state shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this part or the determination was made under factual circumstances meeting the jurisdictional standards of this part and the determination has not been modified in accordance with this part.
California Code (1999), Section 3443 of the Family Code.[25] Section 3443, identical to Section 303 of the UCCJEA, also requires that due process have been afforded the parties to the initial custody proceeding. In promulgating Section 303, NCCUSL explained that:
This section is based on Section 13 of the UCCJA which contained the basic duty to enforce. The language of the original section has been retained and the duty to enforce is generally the same.
UCCJEA, § 303 comment. Comments to Section 13[26] of the UCCJA in turn state:
Recognition is accorded to a decree which is valid and binding under section 12. . . . Under this interpretation a state is permitted to recognize a custody decree of another state regardless of lack of personal jurisdiction, as long as due process requirements of notice and opportunity to be heard have been met.

UCCJA, Section 13 comment (emphasis added). Thus, a prerequisite for enforcing a sister state's custody decree is that all parties were afforded both proper notice and an opportunity to be heard during the proceedings leading up to that decree. See In re Termination of Parental Rights to Thomas J.R., 262 Wis.2d 217, 663 N.W.2d 734, 741 (2003) (acknowledging that in order for a custody determination issued by one state to be valid and recognized by a sister state, the parties must have been afforded notice and an opportunity to be heard); Arkansas Dep't of Human Serv. v. Cox, 349 Ark. 205, 82 S.W.3d 806, 811 n. 1 (2002) ("[U]nder the UCCJEA, no child-custody determination order may be enforced in a foreign state if there was no notice and an opportunity to be heard when the child-custody determination order was issued in the rendering state. The UCCJEA streamlines the process of obtaining enforcement of child-custody determinations in foreign states, but it does not dispense with due process."); Houtchens v. Houtchens, 488 A.2d 726, 731 (R.I.1985) (declining to defer to Texas's simultaneous proceedings because the Texas proceedings "were not in substantial conformity with the due-process requirements of notice and opportunity to be *932 heard"); Roundtree v. Bates, 630 P.2d 1299, 1302 (Okla.1981) ("The [UCCJA] declares that full effect must be given a valid out-of-state decree if the due process requirements of notice and opportunity to be heard have been met.").
Once the Maryland decree has been enrolled in a sister state, modification jurisdiction over that decree is controlled by that state's modification statute. In this case, that statute is Section 3423 of the California UCCJEA, which provides:
Except as otherwise provided in Section 3424, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under paragraph (1) or (2) of subdivision (a) of Section 3421 and either of the following determinations is made:
(a) The court of another state determines it no longer has exclusive, continuing jurisdiction under Sections 3422 or that a court of this state would be a more convenient forum under Section 3427.
(b) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
California Code (1999), Section 3423 of the Family Code. Section 3423 was modeled after Section 203 of the UCCJEA, comments to which emphasize that:
[This section] prohibits a court from modifying a custody determination made consistently with this Act by a court in another State unless a court of that State determines that it no longer has exclusive, continuing jurisdiction . . . or that this State would be a more convenient forum. . . . The modification State is not authorized to determine that the original decree State has lost its jurisdiction.
UCCJEA, Section 203 comment.
Thus, under Section 3423, a California court cannot modify a Maryland custody determination unless Maryland determines that it no longer has continuing jurisdiction. The Maryland UCCJA has a similar provision, Section 9-214(a).[27] The purpose behind this prohibition against modification is to prevent two states from exercising concurrent jurisdiction and maintaining simultaneous proceedings. We had the opportunity to explore modification jurisdiction under the Maryland UCCJA in Harris v. Melnick, 314 Md. 539, 552 A.2d 38 (1989), where we explained that
FL § 9-214(a) is § 14(a) of the Uniform Act. The reporter for the Uniform Act was Professor Brigitte M. Bodenheimer whose extensive writings on that subject highlight the importance of § 14(a).
* * *
Bodenheimer . . . points out that "the rules governing modification jurisdiction are markedly different from the rules applicable to initial jurisdiction." Initial jurisdiction is determined primarily by § 3 (FL § 9-204). "Modification jurisdiction, on the other hand, is governed primarily by Section 14, reinforced, where necessary, by the stronger clean hands rule of Section 8(b). As the Commissioners' Note to Section 6 states, *933 `once a custody decree has been rendered in one state, jurisdiction is determined by Sections 8 and 14.' This means that only one state  the state of continuing jurisdiction  has power to modify the custody decree. Only that state decides whether to decline the exercise of its jurisdiction in any particular case. The rule is clear and simple. There can be no concurrent jurisdiction and no jurisdictional conflict between two states."
Id. at 548-550, 552 A.2d at 42-43 (citations omitted) (emphasis added). We determined in Harris that, because Maryland had issued the initial custody decree,
If Maryland retained continuing jurisdiction over the subject matter, then the Md. Uniform Act does not restrain the exercise of that jurisdiction. Under that circumstance FL § 9-214(a) contemplates that continuing jurisdiction will be exercised and the [other state's] counterpart statute instructs the courts of that state that they "shall not modify" the Maryland decree.
Id. at 552, 552 A.2d at 44.
Thus, in order for a second state to modify the initial decree issued by a Maryland court, the parties must have been afforded due process in the issuance of the initial decree, and the Maryland court must relinquish jurisdiction. The court may relinquish jurisdiction under Section 9-207(a) of the Maryland UCCJA, which provides in relevant part:
(a) Action if this State is inconvenient forum.  A court which has jurisdiction under this subtitle to make an initial decree or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.
* * *
(e) Action on finding of inconvenient forum.  If the court finds that it is an inconvenient forum and that a court of another state is a more appropriate forum, it may dismiss the proceedings, or it may stay the proceedings on condition that a custody proceeding be promptly commenced in another named state or on any other conditions which my be just and proper, including the condition that a moving party stipulate the party's consent and submission to the jurisdiction of the other forum.
Maryland Code (1999), §§ 9-207(a) and (e) of the Family Law Article. Once this has occurred, Maryland no longer has jurisdiction to issue further custodial determinations in the relinquished matter.
In this case, it is clear that Maryland was the C. children's "home state" at the time of the commencement of the proceeding as the children had been residing in Maryland with Mrs. C. since 2001, and that the circuit court's order immediately transferring custody of the three children to Mr. C. was the "initial decree," and therefore Maryland retained exclusive jurisdiction to modify that decree. When Mrs. C. subsequently enrolled the initial decree with the Superior Court of California, however, the circuit court judge in Maryland, after speaking with the California judge, transferred jurisdiction over the matter to California. See Harris, 314 Md. at 556, 552 A.2d at 46 (stating the circuit court had authority under Section 9-207 to transfer custody to Colorado if it concluded that Colorado was a more convenient forum).
Therefore, we can no longer afford Mrs. C. a remedy in the Maryland courts for what we believe is a denial of her due process rights.[28] Clearly, however, Mrs. *934 C. continues to suffer collateral consequences from the Maryland judgment because the California court has relied upon that judgment in making its own custody determinations, and custody of her three children remains with Mr. C. Thus, the case is not moot.

B. Due Process of Law In Disposition Hearings
Mrs. C. argues that the trial court erroneously adopted the master's recommendations prior to the expiration of the five days required by Maryland Rule 11-111(c) to permit a party to file exceptions and that, therefore, she was denied her due process right to have her exceptions heard by a judicial officer of the court. Mrs. C. contends that, of the various provisions which govern juvenile proceedings, only Section 3-807(d)(3) of the Courts and Judicial Proceedings Article provides for the issuance of an immediate order, and only in the following circumstances: the detention of a child, placement of the child in community detention, or placement in shelter care. Maryland Code (1974, 2002 Rep. Vol.), § 3-807(d)(3) of the Courts and Judicial Proceedings Article. Further, Mrs. C. claims that Rule 11-115(b) is governed by Rule 11-111(c)'s plain language, which requires the court to wait for the expiration of the five days provided for the filing of exceptions before adopting the master's recommendations. Moreover, Mrs. C. avers that the Court of Special Appeals erred in defining Rule 11-115(b)'s use of the word "commitment" as meaning "to transfer of custody" because, consistent with Section 3-807(d)(3) of the Courts and Judicial Proceedings Article, the word should be limited to mean the detention of juveniles or placement in community detention or shelter care.[29] Lastly, Mrs. C. *935 asserts that, even if Rule 11-115(b) permitted the trial court to adopt the master's recommendations prior to the five days permitted by filing exceptions, because such an interpretation of the rule would represent a change in CINA procedures, application of such a change to this case would be fundamentally unfair to Mrs. C. and therefore only should be applied to future cases.
The DSS contends that the Court of Special Appeals was correct in holding that the trial court had the authority under Rule 11-115(b) to immediately adopt the master's recommendations. The Court of Special Appeals' interpretation is further supported, the DSS argues, by Section 3-802(b) of the Courts and Judicial Proceedings Article, which requires that all CINA provisions be construed liberally. Maryland Code (1974, 2002 Rep. Vol.), Section 3-802(b) of the Courts and Judicial Proceedings Article. With regard to Section 3-807(d)(3) of the Courts and Judicial Proceedings Article, the DSS alleges that Section 3-807(d)(3) was designed to give masters the authority to issue an immediate order in a limited number of emergency situations where immediate protection of the child is necessary. Contrary to Mrs. C.'s contentions, the DSS asserts that, when compared with Rule 11-115(b), which only permits a master to implement his or her recommendations immediately, not issue an order, it becomes clear that Section 3-807(d)(3) was intended to expand upon, not limit, the authority delegated to masters under Rule 11-115(b). Further, the DSS maintains that, if masters are capable of issuing immediate orders in CINA proceedings pursuant to Section 3-807(d)(3), trial judges also can issue immediate orders in CINA proceedings pursuant to Rule 11-115. Lastly, the DSS asserts that, because Rule 11-115 took effect over thirty years ago, its application in this case is not novel and therefore the Court of Special Appeals' holding was not unfair to Mrs. C.
The question of whether the circuit court erred in adopting the master's recommendations prior to the expiration of five days requires us to construe statutes *936 and provisions of the Rules. Public Service Com'n of Maryland v. Wilson, 389 Md. 27, 45, 882 A.2d 849, 860 (2005); Davis v. Slater, 383 Md. 599, 604, 861 A.2d 78, 80-81 (2004). We apply the same principles when interpreting rules as we apply when interpreting statutes. Davis, 383 Md. at 604, 861 A.2d at 80-81; Pickett v. Sears, Roebuck & Co., 365 Md. 67, 77, 775 A.2d 1218, 1223 (2001). We begin our analysis by first looking to the plain meaning of the rule's language, our examination of which is guided by the principle that we should read the rule as a whole, "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); Kane v. Board of Appeals of Prince George's County, 390 Md. 145, 162, 887 A.2d 1060, 1070 (2005); Giant Food, Inc. v. Dep't of Labor, 356 Md. 180, 194, 738 A.2d 856, 860-61, 863 (1999). If the language of the rule is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to legislative history, case law, and statutory purpose. Mayor of Oakland, 392 Md. at 316, 896 A.2d at 1045; Canaj, Inc. v. Baker and Div. Phase III, 391 Md. 374, 403, 893 A.2d 1067, 1084 (2006); Comptroller v. Phillips, 384 Md. 583, 591, 865 A.2d 590, 594 (2005). If, however, the rule is "clear and unambiguous, we need not look beyond the provision's terms to inform our analysis." City of Frederick v. Pickett, 392 Md. 411, 427, 897 A.2d 228, 237 (2006), quoting in turn Davis, 383 Md. at 604-05, 861 A.2d at 81. In construing the meaning of the rule's language, however, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." General Motors Corp. v. Seay, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005) quoting Davis, 383 Md. at 605, 861 A.2d at 81.
Section 3-807 of the Courts and Judicial Proceedings Article grants masters the authority to conduct juvenile proceedings such as disposition hearings and states in relevant part:
(c) Exceptions to findings, conclusions, and recommendations. 
(1) Any party, in accordance with the Maryland Rules, may file written exceptions to any or all of the master's findings, conclusions, and recommendations, but shall specify those items to which the party objects.
* * *
(d) Proposals and recommendations. 
(1) The proposals and recommendations of a master for juvenile causes do not constitute orders or final action of the court.
(2) The proposals and recommendations shall be promptly reviewed by the court, and, in the absence of timely and proper exceptions, they may be adopted by the court and appropriate orders entered based on them.
(3) Detention, community detention, or shelter care may be ordered by a master pending court review of the master's findings, conclusions, and recommendations.
Maryland Code (1974, 2002 Supp. Vol.), Section 3-807 of the Courts and Judicial Proceedings Article (emphasis added). This authority is governed by Rule 2-541, which provides in pertinent part:
(f) Entry of Order. (1) The court shall not direct the entry of an order or judgment based upon the master's recommendations until the expiration of the time for filing exceptions, and, if exceptions are timely filed, until the court rules on the exceptions.
Maryland Rule 2-541. Disposition hearings are guided by Maryland Rule 11-115, the relevant part of which states:

*937 b. Disposition  Judge or master. The disposition made by the court shall be in accordance with Section 3-820(b) of the Courts Article. If the disposition hearing is conducted by a judge, and his order includes placement of the child outside the home, the judge shall announce in open court and shall prepare and file with the clerk, a statement of the reasons for the placement. If the hearing is conducted by a master, the procedures of Rule 11-111 shall be followed. In the interest of justice, the judge or master may decline to require strict application of the rules in Title 5, except those relating to the competency of witnesses. A commitment recommended by a master is subject to approval by the court in accordance with Rule 11-111, but may be implemented in advance of court approval.[30]
Maryland Rule 11-115 (emphasis added). Thus, Rule 11-115(b) explicitly requires that proceedings before a master follow the procedures set forth in Rule 11-111, which provides:
a. Authority. 1. Detention or shelter care. A master is authorized to order detention or shelter care in accordance with Rule 11-112 (Detention or Shelter Care) subject to an immediate review by a judge if requested by any party.
2. Other matters. A master is authorized to hear any cases and matters assigned to him by the court, except a hearing on a waiver petition. The findings, conclusions and recommendations of a master do not constitute orders or final action of the court.
b. Report to the court. Within ten days following the conclusion of a disposition hearing by a master, he shall transmit to the judge the entire file in the case, together with a written report of his proposed findings of fact, conclusions of law, recommendations and proposed orders with respect to adjudication and disposition. A copy of his report and proposed order shall be served upon each party as provided by Rule 1-321.
c. Review by court if exceptions filed. Any party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders. Exceptions shall be in writing, filed with the clerk within five days after the master's report is served upon the party, and shall specify those items to which the party excepts, and whether the hearing is to be de novo or on the record.
Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions. An excepting party other than the State may elect a hearing de novo or a hearing on the record. If the State is the excepting party, the hearing shall be on record, supplemented by such additional evidence as the judge considers relevant and to which the parties raise no objection. In either case the hearing shall be limited to those matters to which exceptions have been taken.

*938 d. Review by court in absence of exceptions. In the absence of timely and proper exceptions, the master's proposed findings of fact, conclusions of law and recommendations may be adopted by the court and the proposed or other appropriate orders may be entered based on them. The court may schedule and conduct a further hearing supplemented by such additional evidence as the court considers relevant and to which the parties raise no objection. Action by the court under this section shall be taken within two days after the expiration of the time for filing exceptions.
Maryland Rule 11-111.
When construing these rules, we must bear in mind that they are "precise rubrics," established to promote the orderly and efficient administration of justice, and thus are to be strictly followed. Gen. Motors Corp. v. Seay, 388 Md. 341, 356, 879 A.2d 1049, 1057 (2005) (holding that General Motors forfeited its right to file a motion for judgment not withstanding the verdict when it failed to renew its motion after the close of all evidence as Rule 2-519(a) required); Harvey v. Williams, 319 Md. 238, 242 n. 2, 572 A.2d 149, 151 n. 2 (1990) (declining, pursuant to Rule 8-303(b)(6), to address questions not presented in the petitioner's petition for certiorari); King v. State Roads Comm'n, 284 Md. 368, 371-72, 396 A.2d 267, 269-70 (1979) (holding that a new trial was warranted when trial judge struck five jurors, thereby violating Rule 543's requirements for peremptory challenges); Robinson v. Board of County Comm'rs, 262 Md. 342, 346, 278 A.2d 71, 73-74 (1971) (vacating trial court's granting of motion dismissing action against two police officers filed pursuant to Rule 323(b) because the rule did not apply to public officers).
The Court of Special Appeals correctly held that the circuit court erred in relying on Maryland Rule 9-208(h)(2) for its authority to immediately adopt the master's recommendations because Title 9 of the rules "do[es] not apply to actions in a juvenile court." Maryland Rule 9-201. The Court of Specials Appeals erred, however, when it further determined that, pursuant to Rule 11-115(b), the trial court had the authority to implement the master's recommendations prior to the expiration of the five days for filing exceptions and that Mrs. C.'s right to file exceptions under Rule 11-111(c) persisted in spite of the trial court's immediate order.
By Rule 11-115(b)'s plain language, a master's recommendations are "subject to approval by the court in accordance with Rule 11-111," and Rule 11-111 unmistakingly provides parties five days to file exceptions to a master's recommendations. The fact that Rule 11-111 prohibits the trial court from taking any action on the master's recommendations before the expiration of those five days is evinced by subsection (d) of Rule 11-111. Subsection (d), entitled "Review by court in absence of exceptions," which requires that the trial court take action within two days after the expiration of the five-day period for filing exceptions. Any interpretation of Rule 11-111 permitting a trial court to adopt the master's recommendations prior to the expiration of the exceptions period would render this provision of subsection (d) nugatory and impair a party's right to file exceptions. Accordingly, Rule 11-115(b)'s provisions purportedly permitting a master to immediately implement his or her recommendations cannot be interpreted in such a way as to obviate a party's right to Rule 11-111(c)'s five-day exceptions period, as evinced by Rule 2-541(f), which states that "[t]he court shall not direct the entry of an order or judgment based upon the master's recommendations until the expiration of the time for filing exceptions."
*939 Moreover, to hold that a party's right to file exceptions persists even after the trial judge has adopted the master's recommendations contravenes the very purpose for affording parties the opportunity to except. As Judge Alan M. Wilner, writing for this Court, reflected in O'Brien v. O'Brien, 367 Md. 547, 790 A.2d 1 (2002):
[E]xceptions serve a dual purpose  to inform the court, first, that the excepting party is not satisfied with the master's recommendation, and, second, of the reason why the court should not accept that recommendation.

Id. at 555, 790 A.2d at 5-6. Thus, once the trial court has adopted the master's recommendations, the very purpose for filing exceptions has been undermined.
Central to our conclusion in this case is the recognition of the fact that a master's recommendations are not binding upon the parties and do not carry the force of the law until they are adopted by the trial judge. See Maryland Code (1974, 2002 Rep. Vol.), Section 3-807(d)(1) of the Courts and Judicial Proceedings Article ("The proposals and recommendations of a master for juvenile causes do not constitute orders of final action of the court.") (emphasis added); Maryland Rule 11-111(a)(2) ("The findings, conclusions and recommendations of a master do not constitute orders or final action of the court.") (emphasis added). See also Anthony Plumbing of Maryland, Inc. v. Attorney General, 298 Md. 11, 16, 467 A.2d 504, 506 (1983) ("The master's findings do not finally dispose of the litigation in the trial court; they may be excepted to by the parties and are not binding until confirmed and implemented by the trial court."); Caldor, Inc. v. Bowden, 330 Md. 632, 658, 625 A.2d 959, 971 (1993); Anderson, 272 Md. at 102-03, 321 A.2d at 525-26 ("The court may, by special reference, require [a master] to hear evidence and find and report facts to the [trial judge], but before such finding can become binding, it must be approved by the court.") (quoting Boston v. Nichols, 47 Ill. 353 (1868)).
A master's recommendations do not constitute an order binding upon the parties because there exists a clear distinction between the role of a master and that of a judge. We had the opportunity to explore the role of the trial judge vis-a-vis the master in Domingues v. Johnson, 323 Md. 486, 593 A.2d 1133 (1991). We held that a trial judge, when reviewing a party's exceptions, was first required to determine whether the master's factual findings were clearly erroneous, and then to exercise his or her own independent judgment to determine whether the master had reached the correct legal conclusions based upon those factual findings. We emphasized that the trial judge's own independent judgment is required because
[l]itigants in a child custody proceeding, as in all judicial proceedings, are entitled to have their cause determined ultimately by a duly qualified judge of a court of competent jurisdiction. . . . While the system of resorting to Masters is one of long standing and undoubtedly has salutary effects resulting in the more expeditious dispatch of the judicial process, the system cannot supplant the ultimate role of judges in the judicial process itself.
Id. at 492, 593 A.2d at 1135-36 (emphasis added). See also O'Brien, 367 Md. at 554, 790 A.2d at 5 ("[A] master is not a judicial officer, and is not vested with judicial powers."); In re Dewayne H., 290 Md. 401, 402 n. 1, 430 A.2d 76, 77 n. 1 (1981), quoting in turn Anderson, 272 Md. at 106, 321 A.2d at 527 ("[A] master is a ministerial officer, and not a judicial officer. . . . [U]nder the Maryland Constitution a master is entrusted with no part of the judicial power of this State.").
Thus, to protect a party's right to have a matter heard by a judge, Rule 11-111(c) *940 requires that "upon the filing of exceptions," the trial judge must hold "a prompt hearing" on those exceptions. The import of this provision was iterated by the Court of Special Appeals in Matter of Jackson, 22 Md.App. 108, 321 A.2d 827 (1974), where Ms. Jackson filed exceptions to a master's findings and recommendations pursuant to Rule 908(e)(2), the predecessor to Rule 11-111(c). The trial court subsequently held a de novo hearing on the exceptions, causing Ms. Jackson to appeal on the ground that the de novo hearing before the trial judge had denied her the opportunity to directly challenge the master. The Court of Special Appeals held that the statutory scheme whereby a trial court, after exceptions are taken to the recommendations of a master, hears the matter de novo, did not violate a party's due process of law. In so doing, the court emphasized that
[t]he clear import of the law is that the hearing de novo before the judge is the only means of challenging the findings and recommendations of the master (and, by necessary implication, the propriety of the procedures by which the master arrived at those findings and recommendations).
Id. at 111, 321 A.2d at 828-29.
As Rule 11-111's provisions demonstrate, the only circumstances under which a party is guaranteed a hearing before a trial judge are those in which the party has filed exceptions. See Maryland Rule 11-111(c) ("Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions."). Cf. Maryland rule 11-111(d) ("In the absence of timely and proper exceptions. . . [t]he court . . . may schedule and conduct a further hearing."). Thus, the right to file exceptions is a required protective provision of litigants' due process right to have his or her matter heard by a duly qualified judge. Accordingly, in the case before us, when the trial judge adopted the master's recommendations only two days after the disposition hearing, he not only failed to observe Rule 11-111(c), but also violated Mrs. C.'s right to have five days to file exceptions to the master's recommendations.
The DSS contends, however, that, in light of the escalating difficulties Gunner was having in his foster care home, the circuit court was justified in immediately transferring custody of the children to Mr. C. instead of perpetuating their stay in various foster care homes, an action that was consistent with our holding in In re Adoption/Guardianship No. 10941, 335 Md. 99, 104, 642 A.2d 201, 204 (1994). We disagree. In Adoption/Guardianship No. 10941, we had the occasion to address the guidelines for placement of children outside of their homes as set forth in Maryland's foster care legislation and in so doing we recognized that a child's best interests are served through the establishment of permanency in a child's life and the minimization of time spent in foster care. Id. at 106, 642 A.2d at 205. We emphasized that, in determining what placement is most appropriate for a child, in addition to the child's best interests, "[a]nother important interest that must be considered . . . is the right of a parent to raise his or her child. This right, recognized by constitutional principles, common law and statute, is so fundamental that it may not be taken away unless clearly justified." Id. at 112, 642 A.2d at 208. Thus, when the court seeks to place a child outside of his or her home, "[t]he welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent." Id.
In the case sub judice, the circuit court cited in its disposition order that "Gunner's current foster care placement is jeopardized due to his poor behavior and his immediate placement with his father is in his best interests." In so doing, the circuit *941 court failed to recognize that the need for permanent placement in a child's life does not obviate the parent's right to due process.
We therefore hold that the circuit court erred in adopting the master's recommendations prior to the expiration of the five days afforded by Rule 11-111(c) for filing exceptions. Because California has assumed jurisdiction over the C. children's custody proceedings, however, the only remedy that we can provide Ms. C. is to reverse the Court of Special Appeals' judgment and remand this case to the Circuit Court for Frederick County with orders to dismiss the case, thereby relieving Ms. C. of the collateral consequences she continues to suffer from the Maryland judgment.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS THAT THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY BE REVERSED AND THE CASE REMANDED TO THE CIRCUIT COURT WITH INSTRUCTIONS TO DISMISS THE ACTION; COSTS TO BE PAID BY FREDERICK COUNTY IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.
Judge WILNER joins in the judgment only.
NOTES
[1] Because we will reverse both the decision of the Court of Special Appeals and the circuit court on that error alone, we shall not address the third issue that Mrs. C. raised in her petition for writ of certiorari, specifically, whether the intermediate appellate court erred when it applied its decision to Petitioner.
[2] Shelter care "means a temporary placement of a child outside of the home at any time before disposition." Maryland Code (1973, 2002 Repl.Vol.), § 3-801(w) of the Courts and Judicial Proceedings Article.
[3] Maryland Code (1973, 2002 Repl.Vol.), § 3-815(b) of the Courts and Judicial Proceedings Article provides in pertinent part:

A local department may place a child in emergency shelter care before a hearing if:
(1) Placement is required to protect the child from serious immediate danger;
(2) There is no parent, guardian, custodian, relative, or other person able to provide supervision; and
(3)(i)1. The child's continued placement in the child's home is contrary to the welfare of the child; and
2. Because of an alleged emergency situation, removal from the home is reasonable under the circumstances to provide for the safety of the child; or
(ii)1. Reasonable efforts have been made but have been unsuccessful in preventing or eliminating the need for removal from the child's home; and
2. As appropriate, reasonable efforts are being made to return the child to the child's home.
[4] Maryland Code (1973, 2002 Repl.Vol.), Section 3-815(c) of the Courts and Judicial Proceedings Article provides in pertinent part:

(1) Whenever a child is not returned to the child's parent, guardian, or custodian, the local department shall immediately file a petition to authorize continued shelter care.
(2)(i) The court shall hold a shelter care hearing on the petition before the disposition to determine whether the temporary placement of the child outside of the home is warranted.
(ii) Unless extended on good cause shown, a shelter care hearing shall be held not later than the next day on which the circuit court is in session.
[5] Maryland Code (1973, 2002 Repl.Vol.), Section 3-801(f) of the Courts and Judicial Proceedings Article defines a CINA as:

"Child in need of assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.
[6] Maryland Code (1974, 2002 Rep. Vol.), Section 3-807(d)(3) of the Courts and Judicial Proceedings Article provides in pertinent part:

Detention, community detention, or shelter care may be ordered by a master pending court review of the master's findings, conclusions, and recommendations.
[7] "An adjudicatory hearing is a hearing under the Juvenile Causes subtitle of the Courts and Judicial Proceedings Article of the Maryland Code to determine whether the allegations in a petition for court intervention filed by the county department of social services on behalf of a child, other than the allegation that the child requires the court's intervention, are true." In re Blessen H., 392 Md. 684, 685, 898 A.2d 980, 981 n. 1 (2006), citing Md.Code (1973, 2002 Repl.Vol.), § 3-801(c) of the Courts and Judicial Proceedings Article.
[8] Disposition hearing "means a hearing . . . to determine: (1) Whether a child is in need of assistance; and (2) If so, the nature of the court's intervention to protect the child's health, safety, and well-being." Blessen H., 392 at 685, 898 A.2d at 981 n. 1, quoting Md.Code (1973, 2002 Repl.Vol.), § 3-801(m) of the Courts and Judicial Proceedings Article.
[9] "Russell G." refers to In re Russell G., 108 Md.App. 366, 672 A.2d 109 (1996), in which the Court of Special Appeals held that a child cannot be declared a CINA if one of the child's two parents is willing and able to care for the child.
[10] The docket entry for March 9, 2004 reads:

Order for Adjudication
[F]iled that the Court finds that the following facts as alleged in the petition are true and are sufficient to find that the children need or require the Court's intervention and that the disposition in this matter shall be continued until March 17, 2004 at 1:00 p.m.
[11] Maryland Code (1973, 2002 Repl.Vol.), § 3-819(e) of the Courts and Judicial Proceedings Article provides:

If the allegations in the petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child, the court may not find that the child is a child in need of assistance, but, before dismissing the case, the court may award custody to the other parent.
[12] Dr. Weaver was the psychologist retained to complete assessments of the family and Mr. C.'s fiancee.
[13] The April 21, 2004, docket entry reads "Child Not Found CINA;" and "Custody Original Parent."

The April 23, 2004 docket entry reads "Order for CINA Closure."
[14] California Code (1999), Section 3443 of the Family Code provides:

(a) A court of this state shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this part or the determination was made under factual circumstances meeting the jurisdictional standards of this part and the determination has not been modified in accordance with this part.
(b) A court of this state may utilize any remedy available under other laws of this state to enforce a child custody determination made by a court of another state. The remedies provided in this chapter are cumulative and do not affect the availability of other remedies to enforce a child custody determination.
California Code (1999), Section 3443 of the Family Code.
California adopted the Uniform Child Custody Jurisdiction and Enforcement Act as Part 3 of its Family Code in 1999. 1999 Cal. Stat. Ch. 867.
[15] California Code (1999), Section 3410 of the Family Code provides in pertinent part:

(a) A court of this State may communicate with a court in another state concerning a proceeding arising under this part.
[16] Custody proceeding is defined by Maryland law as any proceeding in which a custody determination is one of several issues and includes a child neglect or dependency proceeding. Maryland Code (1999), Section 9-201(d) of the Family Law Article.

Custody determination is defined by Maryland law as "a judicial decision, order, or instruction that relates to the custody of a child or to visitation rights." Maryland Code (1999), Section 9-201(c) of the Family Law Article.
[17] Under the revised Act, modification jurisdiction means jurisdiction to change, replace, supercede, or otherwise make after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination. Section 102(11) of the Uniform Child Custody Jurisdiction Enforcement Act 1 (Nat'l Conference of Comm'r On Unif. State Laws 1998).
[18] Under the revised Act, custody determination means a judgment, decree or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual. Section 102(3) of the Uniform Child Custody Jurisdiction Enforcement Act 1 (Nat'l Conference of Comm'r On Unif. State Laws 1998).
[19] Initial decree is defined as "the first custody decree concerning a particular child." Maryland Code (1999), Section 9-201(g) of the Family Law Article.
[20] Modification decree is defined as "a custody decree that modifies or replaces a prior decree, whether made by the court that rendered the prior decree or by another court." Maryland Code (1999), Section 9-201(h) of the Family Law Article.
[21] Section 9-205 was repealed in 2004 and replaced by Section 9.5-205, which provides:

(a) In general.  Before a child custody determination is made under this title, notice and an opportunity to be heard in accordance with the standards of § 9.5-107 of this title shall be given to all persons entitled to notice under the law of this State as in child custody proceedings between residents of this State, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child.
(b) Exclusions.  This title does not govern the enforceability of a child custody determination made without notice or an opportunity to be heard.
(c) Joinder and intervention.  The obligation to join a party and the right to intervene as a party in a child custody proceeding under this title are governed by the law of this State as in child custody proceedings between residents of this State.
2004 Maryland Code (1999, 2004 Repl.Vol.), § 9.5-205 of the Family Law Article.
[22] Section 9-212 was repealed in 2004, 2004 Md. Laws Ch. 502, and replaced by 9.5-105, which provides:

(a) Binding.  A child custody determination made by a court of this State that had jurisdiction under this title binds all persons who have been served in accordance with the laws of this State or notified in accordance with § 9.5-107 of this subtitle or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard.
(b) Conclusive.  As to those persons, the determination is conclusive as to all decided issues of law and fact except to the extent the determination is modified.
Maryland Code (1999, 2004 Repl.Vol.), § 9.5-105 of the Family Law Article.
[23] Section 4 provides:

Before making a decree under this Act, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental right have not been previously terminated, and any person who has physical custody of the child. If any of these persons is outside this State, notice and opportunity to be heard shall be given pursuant to section 5.
UCCJA, § 4.
[24] Section 12 provides:

A custody decree rendered by a court of this State which had jurisdiction under section 3 binds all parties who have been served in this State or notified in accordance with section 5 or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions to this Act.
[25] Maryland also has a provision which allows for the enrollment of out-of-state custody determinations, Section 9-213, which provides:

The courts of this State shall recognize and enforce an initial decree or modification decree of a court of another state that had assumed jurisdiction under statutory provisions substantially in accordance with this subtitle, or that was made under factual circumstances meeting the jurisdictional standards of the subtitle, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this subtitle.
Maryland Code (1999), Section 9-213 of the Family Law Article.
[26] Section 13 of the UCCJA provides in relevant part:

The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this Act or which was made under factual circumstances meeting the jurisdictional standards of the Act.
[27] Section 9-214(a) of the Maryland UCCJA provides:

If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court that rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this subtitle or has declined to assume jurisdiction to modify the decree and (2) the court of this State has jurisdiction.
Maryland Code (1999), Section 9-214(a) of the Family Law Article.
[28] Both the Maryland UCCJA and the California UCCJEA, while acknowledging that due process is a prerequisite to the legitimacy of any custody decree, fail to provide a remedy in situations such as the case at bar where a parent alleges denial of due process in the sister state's original award of custody. This discrepancy is evidenced by remedy provisions afforded in other situations, namely where one of the parents has initiated a custodial proceeding by improper means such as kidnaping or seizing physical custody of the child by other illegal means. For example, Section 9-208 of the Maryland UCCJA provides in relevant part:

(a) No existing decree.  If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court may decline to exercise jurisdiction if this is just and proper under the circumstances.
(b) Existing decree.  Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state, the court may decline to exercise its jurisdiction if this is just and proper under the circumstances.
Maryland Code (1999), Section 9-208 of the Family Law Article. Likewise, Section 3428 of the California UCCJEA provides:
(a) Except as otherwise provided in Section 3424 or by any other law of this state, if a court of this state has jurisdiction under this part because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction.
California Code (1999), Section 3428 of the Family Code. These provisions prohibit a sister state from exercising jurisdiction altogether, thereby forcing parents to recognize the home state's jurisdiction and abide by its custodial determinations. No such provision exists when a denial of due process is alleged. Thus, once Mr. C. enrolled Maryland's decree with the California court, no provision was in place to stop California from embracing that decree.
[29] We do not reach the issue of whether the Court of Special Appeals, in dicta, correctly defined the word commitment as used in Rule 11-115(b) because, under Section 3-819(e) of the Courts and Judicial Proceedings Article, before custody can be transferred to another parent, the allegations in the CINA petition first must be sustained against the custodial parent; the record does not clearly reflect that the allegations in the CINA petition were sustained against Mrs. C. Although the master announced during the March 3, 2004 adjudicatory hearing:

[The] mother and father neither admitted nor denied the allegations contained in the petition. However, they did agree that those same allegations would be . . . proven by a preponderance of the evidence and support a finding that the children are children in need of assistance.
The docket entry following that proceeding makes no mention of whether the allegations were sustained against either of the parents. It states:
[F]iled that the court finds that the following facts as alleged in the petition are true and are sufficient to find that the child need or require the's intervention. . . .
Confusion surrounding whether the allegations were sustained against either of the parents was apparent at the April 21, 2004 disposition hearing when counsel for Mrs. C. asked the master:
With respect to the [DSS]'s request, Your Honor, I think that's precluded already by the court's order of March 3rd. The, all parties agreed that the facts in the petition supported a finding of the children that were in need of assistance and that was agreed to on the record and signed by, by the Master and signed by [the circuit court judge] on March 5th. So there's no way that [Section 3-819(e)] cited [to] by the [DSS] is applicable at this point.
The final disposition order also fails to make any mention of whether the CINA petition allegations were sustained against Mrs. C. Whether the allegations in the CINA petition were sustained against Mrs. C. is an issue that could have been resolved had Mrs. C. been afforded a proper opportunity to file exceptions.
[30] Although no challenge to the constitutionality of Maryland Rule 11-115(b)'s provision permitting the immediate implementation of a master's recommendations has been raised in this case, it is important to note that this provision is not consistent with this Court's holdings regarding the role of a master. See e.g. Bar Ass'n v. Marshall, 269 Md. 510, 516, 307 A.2d 677, 680 (1973) (noting that a master's findings and report are "only advisory"); In re Anderson, 272 Md. 85, 105-106, 321 A.2d 516, 527 (1974) (stating that under Article Four, Section One of the Constitution, "[m]asters are not judges and, therefore, are not vested with any part of the judicial power of the State. . . . [A] master's findings do not become binding until approved by a judge."); Harryman v. State, 359 Md. 492, 506-507, 754 A.2d 1018, 1026 (2000), and cases there cited.