912 A.2d 620

Nathaniel COTTMAN

v.

STATE of Maryland.

No. 1 Sept. Term, 2006.

Court of Appeals of Maryland.

Dec. 8, 2006.

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for Petitioner/Cross–Respondent.

Edward J. Kelly, Asst. Atty. Gen. (J, Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Respondent/Cross–Petitioner.

Argued Before: BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

On June 2, 2004, after a non-jury trial in the Circuit Court for Baltimore County, Nathaniel Cottman, Jr. ("Petitioner") was convicted of distribution of cocaine, conspiracy to distribute cocaine, and possession of cocaine. He was sentenced as a repeat offender to ten years in prison, without the possibility of parole, for distribution of cocaine. The remaining convictions were merged for sentencing purposes. After filing a timely notice of appeal to the Court of Special Appeals, both

Petitioner and the State waived oral argument and submitted their respective cases on brief.

On August 18, 2005, in response to Petitioner's request, the trial judge granted Petitioner a new trial, thereby vacating the underlying judgment of conviction and sentence. As we shall explain further in this opinion, the State was not entitled to file a notice of appeal from the order granting a new trial. On October 31, 2005, not having been informed by counsel of that intervening event, the Court of Special Appeals filed its written opinion affirming the Circuit Court's initial judgment and sentence. On November 4, 2005, prior to the Court of Special Appeals's issuance of the formal mandate,[1] Petitioner requested that the appellate court withdraw its opinion and dismiss the appeal as moot, in light of the Circuit Court's decision to grant him a new trial prior to the filing of the Court of Special Appeals's written opinion. On December 15, 2005, the Court of Special Appeals denied both of Petitioner's requests.

Petitioner filed a petition for writ of certiorari [2] in this Court and the State filed a cross-petition.[3] We granted both peti-

---

1. Throughout this opinion, we referenced the "unofficial mandate" and "formal mandate" of the Court of Special Appeals. By unofficial mandate, we are referring to the unofficial judgment of the court as indicated at the very end of its opinion. Because this mandate is not certified by the Clerk of the Court, it constitutes the court's unofficial judgment. The formal mandate mirrors the court's unofficial judgment but is a separate document certified and filed by the Clerk. *See* Maryland Rule 8–606.

   Maryland Rule 8–606, entitled "Mandate," states:

   (a) **To evidence order of the Court.** Any disposition of an appeal, including a voluntary dismissal, shall be evidenced by the mandate of the Court, which shall be certified by the Clerk under the seal of the Court and shall constitute the judgment of the Court.

2. Petitioner presented the following issue in his petition for writ of certiorari:

   Did the Court of Special Appeals err in failing to withdraw its opinion and not dismissing the appeal after the Circuit Court had granted Petitioner a new trial prior to the issuance of the opinion of the Court of Special Appeals?

3. The question presented by the State in its cross-petition was as follows:

tions. *Cottman v. State,* 391 Md. 577, 894 A.2d 545 (2006). The main issue now before this Court is whether the Court of Special Appeals erred when it failed to dismiss the appeal and withdraw the reported opinion, after being informed that the Circuit Court had granted Petitioner a new trial. The Circuit Court issued its order granting Petitioner a new trial while the appeal from the judgment and sentence was pending in the intermediate appellate court. The effect of granting a new trial was to vacate the original judgment and conviction in the trial court that constituted the basis of the appeal. Any issue with regard to the propriety or effect of the grant of a new trial, as to the subject matter on appeal, could not have been decided on appeal for two reasons: (1) the appeal was noted long before the grant of a new trial; and (2) as a practical matter, the issue with regard to the propriety of granting a new trial could not have been raised by the prior notice of appeal. Thus, in this context, the trial court's grant of a new trial constituted an event that the appellate court should have taken into consideration in issuing a mandate. The trial court had fundamental jurisdiction to grant a new trial and, under the circumstances, the granting of a new trial rendered the appeal pending in the Court of Special Appeals moot. Although the Court of Special Appeals had discretion to allow its reported opinion on the moot issues to stand, it had no choice but to reflect in its mandate that the appeal was dismissed.

## FACTUAL BACKGROUND

On August 14, 2002, at approximately 5:45 a.m., undercover Detective, Earnest Moore, drove into the parking lot of the Kingsley Park Apartment Complex in Baltimore County. A woman, later identified as Ms. Benson, yelled "hey, come here," and then walked with a man over to Detective Moore's vehicle. Detective Moore later identified the man as Petition-

---

[W]hether the Court of Special Appeals, prior to issuance of its mandate should have directed the [C]ircuit [C]ourt to vacate its order granting Cottman a new trial because it interfered with the pending appeal.

er. According to Detective Moore, Ms. Benson asked him whether he was a police officer. After Detective Moore stated that he was not a police officer, Petitioner asked "are you sure you're not police"? When Detective Moore answered in the negative, Petitioner walked two feet forward to the left fender of the vehicle and looked up and down the road, while Ms. Benson stayed next to Detective Moore. After some additional discussion, Ms. Benson pulled a small bag of cocaine from underneath her tongue in exchange for a marked twenty-dollar bill from Detective Moore. After the transaction, Detective Moore provided a surveillance team with a description of both subjects. The surveillance team stopped Petitioner and Ms. Benson. A short time later, Detective Moore returned to the area of the previous sale and identified both Petitioner and Ms. Benson, who were then formally arrested. The police did not find any drugs or money on Petitioner's person during the search incident to his arrest.

On June 2, 2004, the morning that Petitioner's trial was to begin in the Circuit Court for Baltimore County, Petitioner's counsel appeared before the administrative judge's designee to request a continuance. Petitioner's counsel argued that he had just located a critical witness for the defense and therefore needed more time. The administrative judge's designee denied the motion, noting that the trial had already been postponed four times. The case then proceeded to a trial on the merits.

Detective Moore testified at trial that Petitioner's actions were consistent with those of a lookout in a typical drug deal and that Petitioner and Ms. Benson walked off together after Detective Moore drove away. Detective Moore noted, however, that he never saw Petitioner and Ms. Benson exchange drugs or money with each other.

The trial judge determined that Detective Moore's testimony was "very credible," and that Petitioner had aided and abetted the distribution of drugs. He therefore found Petitioner guilty of distribution of cocaine, conspiracy to distribute cocaine, and possession of cocaine. Prior to sentencing, Peti-

tioner argued that this incident was one of mistaken identity and that he was innocent. The judge offered Petitioner the opportunity to take a polygraph examination, at his own expense, with the understanding that the court would grant him a new trial if the polygraph showed that he was not involved with this incident.[4] On June 3, 2004, the judge sentenced Petitioner to ten years in prison for distribution.

---

4. The following transcript excerpt demonstrates how the issues before this Court arose. These discussions occurred on June 2, 2004, when the parties were trying to agree upon a time for sentencing.

THE COURT: So therefore, we can't go forward today.

MR. GLASS [Attorney for Petitioner]: Your honor, if I may on the record. [Petitioner] advised me there is this witness which I was told about today but I was not able to get a postponement to get him here nor did I have his address or phone number at the time. That he basically wants that witness to testify to basically to prove his case, and I advised him that he cannot. At this point, the evidence has been completed and I don't think he quite—the person was unaware of the court date so I never got a chance to let him know when the court date was . . .

THE COURT: Sir, excuse me. Wait a minute, Mr. Cottman. I understand the verdict is in and you're not happy with it, but I asked you, do you have any questions about your right to testify or remain silent? You looked me in the eye and said "Judge, I do not." So if you had any question about it at that point, you should have asked it.

MR. COTTMAN: He told me not to speak. I was listening to what my lawyer was saying.

THE COURT: You know, maybe he gave you good advice, but if you had a question about it, the time to raise the question was then.

MR. COTTMAN: Your Honor, this crime I did not do. The person that actually did the crime is willing to come in and testify that he did it.

THE COURT: Excuse me, Mr. Cottman. *I was going to do this in any case anyway because this is a very, very heavy penalty, I would have offered you this possibility—to ask to have a polygraph examination done, file a motion for a new trial.*

Wait a minute. Before you nod your head, you have to listen to me. You have to pay for the polygraph . . . if in fact the polygraph operator shows me the test results and they show that you're being honest when you say you weren't involved in this, then I'm not going to say you are not guilty, and I want everyone to hear that—*I will say you're entitled to a new trial either before a judge or jury and to bring in any witnesses you want to testify.* But I want to say this to you, sir, that if in fact you did do it, there's no way you can beat the polygraph.

MR. COTTMAN: I understand.

(Emphasis added.)

Shortly thereafter, Petitioner noted a timely appeal to the Court of Special Appeals.[5]

On July 25, 2005, while Petitioner's appeal was still pending in the Court of Special Appeals and before that court filed its opinion, he filed in the Circuit Court a request for appropriate relief based on the results of the polygraph examination. The Circuit Court held a hearing on this request, and on August 18, 2005, issued an order granting Petitioner a new trial. Petitioner, however, did not notify promptly the intermediate appellate court of this event. On October 31, 2005, more than two months after the Circuit Court granted Petitioner a new trial, the Court of Special Appeals filed its reported opinion, *Cottman v. State*, 165 Md.App. 679, 886 A.2d 932 (2005), in which it expressed its view on the question of first impression: whether a defendant may be convicted of distribution of a controlled dangerous substance (CDS) on an aiding and abetting theory of culpability. It affirmed the previous judgment of conviction and sentence of the Circuit Court. On November 4, 2005, Petitioner requested, in writing, that the appellate court vacate its opinion and dismiss the appeal, on the basis that the issues were moot, because the Circuit Court had granted Petitioner a new trial before the Court of Special Appeals filed its opinion. Petitioner subsequently filed a memorandum of law, arguing that the Circuit Court retained jurisdiction to award him a new trial while the appeal was pending and that the State had waived any claim to the contrary.

The Court of Special Appeals directed the State to respond to Petitioner's memorandum. On November 17, 2005, the State did so and acknowledged that the Circuit Court retained jurisdiction to make post-judgment rulings in Petitioner's criminal case. It argued, however, that the intermediate appellate court should vacate the order of the Circuit Court granting Petitioner's new trial because the Circuit Court's

---

**5.** Pending the appeal in the Court of Special Appeals, Petitioner subsequently acquired the necessary funds, underwent a polygraph examination, and passed the examination.

order frustrated the actions of the appellate court. On December 15, 2005, the Court of Special Appeals denied Petitioner's requests and issued its formal mandate. The intermediate appellate court by its mandate purported to affirm the Circuit Court's judgment of June 3, 2004, which had subsequently been set aside by the grant of a new trial. The Court of Special Appeals did not direct the Circuit Court to vacate its order granting Petitioner a new trial.

## DISCUSSION

### A.

### The Circuit Court's Order Granting Petitioner a New Trial

First, we point to the issues that are not before this Court and were not properly before the Court of Special Appeals. Neither this Court nor the intermediate appellate court obtained jurisdiction to rule on the propriety of the Circuit Court's post-trial order granting Petitioner a new trial, because that order was not the subject matter of the initial appeal. In addition, whether the grant of the new trial interfered with the subject matter on appeal is not an issue before the appellate courts because that issue, likewise, was not the subject matter of the initial appeal. Because these two matters are not issues on appeal, neither the Court of Special Appeals nor this Court has jurisdiction to vacate, reverse, or affirm the order granting Petitioner a new trial.[6]

---

6. Md. Code (2002 Repl. Vol.) § 12–302(c) of the Courts and Judicial Proceedings Article provides the State a limited right of appeal in criminal cases. We have said, "[u]nless the issue presented may properly be categorized as one of the actions enumerated in the statute, the State has no power to seek appellate review." *State v. Manck,* 385 Md. 581, 597, 870 A.2d 196, 206 (2005) (holding that the State did not have a statutory right to appeal from the trial court's grant of the defendant's motion to strike the State's notice of intention to seek the death penalty in a capital murder prosecution). In the present case, because the right is not provided by statute, the State had no right to appeal the Circuit Court's grant of a new trial. Rule 8–201, "**Method of securing review—Court of Special Appeals,**" section (a), "**By notice of**

Notwithstanding these facts, we will discuss the issues to address the contentions of both parties and to help elucidate, and provide background information for, the main issue before this Court: whether the Court of Special Appeals erred when it failed to dismiss the appeal and withdraw its reported opinion, after Petitioner notified the intermediate appellate court that he had been granted a new trial.

Petitioner contends that the Circuit Court had jurisdiction [7] to grant the new trial motion, despite his pending appeal. He relies on the proposition that, as we first stated in *Pulley v. State,* 287 Md. 406, 412 A.2d 1244 (1980), "a circuit court is not divested of fundamental jurisdiction [8] to take post-judgment action in a case merely because an appeal is pending from the judgment." *Jackson v. State,* 358 Md. 612, 620, 751 A.2d 473, 477 (2000).

The State concedes that the Circuit Court retained jurisdiction to entertain post-trial matters under the general rule in *Pulley,* even after an appeal is filed. The State also cites *Jackson,* however, to convey that, because of a limitation

---

**appeal,"** provides that "[e]xcept as provided in Rule 8–204, the only method of securing review by the Court of Special Appeals is by the filing of a notice of appeal within the time prescribed by Rule 8–202...." *See e.g., Munson Co. v. Secretary of State,* 294 Md. 160, 168, 448 A.2d 935, 939–40 (1982) (stating that "[a] party to a trial court proceeding ... is not entitled to seek direct appellate review and reversal of the trial court's judgment unless he has filed a valid, timely order of appeal"). We contrast the current case with *In re Emileigh F.,* 355 Md. 198, 733 A.2d 1103 (1999), where a second order of appeal by a child's mother in a CINA case, taken after the trial court's order that terminated jurisdiction, permitted this Court to review that order and vacate it.

7. The term "jurisdiction," when applied to courts " 'is a term of large and comprehensive import and embraces every kind of judicial action.' " *Pulley v. State,* 287 Md. 406, 415, 412 A.2d 1244, 1249 (1980) (citations omitted).

8. "Fundamental jurisdiction" means "the power residing in a court to determine judicially a given action, or question presented to it for a decision, over the subject matter of the proceedings." *In re Emileigh F.,* 355 Md. at 202, 733 A.2d at 1105 (citing *Pulley,* 287 Md. at 415–16, 412 A.2d 1244, 1249–50).

to the general rule, the Circuit Court did not have jurisdiction to grant Petitioner a new trial. The State relies on this Court's statement in *Jackson* that "[w]hat the court may *not* do is to *exercise* that jurisdiction in a manner that affects either the subject matter of the appeal or the appellate proceeding itself—that, in effect, precludes or hampers the appellate court from acting on the matter before it." *Jackson,* 358 Md. at 620, 751 A.2d at 477.[9] The State contends that the Circuit Court's order granting Petitioner a new trial while the appeal was pending frustrated the actions of the appellate court, and that the Circuit Court's order should therefore be vacated or rendered null and void.[10]

We disagree with the State's contention, as it applies to this case. As Petitioner points out, we have held since *Pulley v. State,* that trial courts are not stripped of their jurisdiction to take post-judgment action simply because an appeal is pending from that judgment. We have said that " '[i]f the trial court does . . . decide to proceed during the pendency of the appeal, it, absent a stay required by law, or one obtained from an appellate court, has the authority to exercise the 'funda-

---

9. We note that both parties cite *Jackson v. State* as the authority for their assertions. *Jackson* is distinguishable from this case and is actually dicta, because, in that case, the trial court denied the motion for a new trial. In *Jackson,* we examined whether the trial court interfered with the subject matter on appeal when it denied Petitioner's request for a new trial at the time that an appeal was pending. We expressly avoided the issue in *Jackson* that we are asked to address today. In *Jackson,* we stated explicitly that "[w]e need not consider in this appeal whether an order *granting* the motion for new trial would have been subject to reversal on the ground noted. That would, indeed, have presented some interesting issues . . . ." 358 Md. 612, 621, 751 A.2d 473, 477 (2000).

10. We reiterate that the appellate court has no power to vacate an order where there is no appeal of that order. *See generally, In re Emileigh F.,* 355 Md. 198, 733 A.2d 1103 (1999) (demonstrating that notice of appeal is required to put that order squarely before the appellate court). Thus, the issues as to the propriety of granting a new trial and its effect on the appellate proceedings are not properly before this Court. *See also State v. Peterson,* 315 Md. 73, 82 n. 3, 553 A.2d 672, 677 n. 3 (1989) (pointing out that the propriety of the trial court's action pending the appeal as opposed to the power to proceed pending appeal was not before us).

mental jurisdiction' which it possesses.'" *Peterson,* 315 Md. at 81, 553 A.2d at 676 (quoting *Pulley,* 287 Md. at 419, 412 A.2d at 1251).

The issue of whether the grant of a new trial interfered with the subject matter on appeal is not properly before us, nor was it before the Court of Special Appeals. Even if that issue were a proper subject of this appeal, we are not persuaded that the Circuit Court's grant of a new trial interfered with the subject matter of the appeal. We reach this conclusion because the trial court did not re-decide the merits of the case or rule upon the issues pending before the appellate court; it simply eliminated the need for an appeal, *ipso facto.* We have "consistently taken the view that, when an appeal is taken, the trial court may continue to act with reference to matters not relating to the subject matter of, or matters not affecting, the appellate proceeding...." *Peterson,* 315 Md. at 80, 553 A.2d at 676. Had the trial court revisited the substantive issues of the case, or had the subject matter on appeal been whether the trial court should have granted Petitioner a new trial, our answer might be different.

This distinction is consistent with prior opinions of this Court and the Court of Special Appeals where a circuit court's actions did not interfere with the subject matter on appeal. *See, e.g., Pulley,* 287 Md. at 414, 412 A.2d at 1248–49 (holding that Petitioner's immediate appeal of the trial court's denial of his motion to dismiss did not deprive the trial court of its " 'fundamental jurisdiction' to adjudicate the controversy relating to the subject matter of th[e] criminal cause"); *Jackson,* 358 Md. at 621, 751 A.2d at 477–78 (concluding that the Circuit Court's denial of Petitioner's motion for a new trial while her appeal from her convictions was pending did not interfere with the subject matter on appeal); *Folk v. State,* 142 Md.App. 590, 791 A.2d 152 (2002) (holding that a circuit court retains the fundamental jurisdiction to rule on a defendant's motion for a new trial even when an appeal is pending in the Court of Special Appeals). *Cf. In re Emileigh F.,* 355 Md. 198, 733 A.2d 1103 (1999) (holding that the Circuit Court interfered with the subject matter on appeal in a CINA proceeding by

closing the case and terminating jurisdiction over the minor, because the question of custody and fairness of the procedure used to determine custody was still pending in the Court of Special Appeals and the issue was properly raised in the appellate court because there was a second order from which an appeal was taken).

█ Furthermore, if the issue were properly before the appellate courts and the State's contention were correct, our observation in *Jackson* dictates that if a post-judgment trial court's decision affected the subject matter of a pending appeal, it "may be subject to reversal on appeal, but it is not void *ab initio* for lack of jurisdiction to enter it." *Jackson,* 358 Md. at 620, 751 A.2d at 477. *See also County Comm'rs of Carroll County v. Carroll Craft Retail, Inc.,* 384 Md. 23, 45, 862 A.2d 404, 418 (2004) (stating that any ruling by a circuit court that interferes with the subject matter on appeal is "reversible on appeal, not void for lack of jurisdiction"). Under this reasoning, the Circuit Court's grant of a new trial would not be rendered void, automatically, even if we determined that it was not proper to grant a new trial. Moreover, the State has not presented us any other reasons as to why the Circuit Court did not have the authority to grant Petitioner a new trial. Thus, we conclude that the Circuit Court had fundamental jurisdiction to grant a new trial and the propriety of that order and the effect on the subject matter of the pending appeal were neither then nor now subject to appellate review.

## B.

### The Court of Special Appeals's Denial of Petitioner's Request

█ We must next examine the issue properly before us in this case: whether the Court of Special Appeals should have decided the issues on appeal when the trial court granted a new trial, before the intermediate appellate court filed its opinion, and whether the intermediate appellate court acted

properly when it denied Petitioner's request to withdraw its opinion and dismiss the appeal.

Petitioner argues that once the Circuit Court granted him a new trial, there no longer existed any judgment to be reviewed. He contends that by eliminating the final judgment, the Circuit Court rendered the appeal moot. According to Petitioner, because courts are not charged with the task of deciding moot or abstract questions, the Court of Special Appeals should have withdrawn its opinion and dismissed Petitioner's appeal.

The State counters that the case was not moot at the time that the Court of Special Appeals filed its reported opinion, because there still remained an existing controversy between the parties. The State contends that Petitioner's insufficiency of the evidence claim was still in controversy when the court filed its opinion, making Petitioner's mootness claim untenable. We disagree.

In our view, Petitioner's appeal became moot the instant that the Circuit Court granted him a new trial. We have said that "[i]t is generally recognized that the effect of granting a new trial is to leave the cause in the same condition as if no previous trial had been held." *Snyder v. Cearfoss,* 186 Md. 360, 367, 46 A.2d 607, 610 (1946); *see also Cook v. Toney,* 245 Md. 42, 50, 224 A.2d 857, 861 (1966) (holding that when the new trial was granted, the verdict and judgment were eliminated entirely and the case was put back in the same condition as if no trial had ever been held). When a court orders a new trial, "the beneficial procedural incidence of the order is to reestablish the equality in law of the parties, which was lost, by restoring them to the position of the litigants at the beginning of the trial before a jury." *State v. Balt. Transit Co.,* 177 Md. 451, 454, 9 A.2d 753, 754 (1939). Because the Circuit Court's grant of a new trial eliminated the judgment of conviction, there no longer remained a judgment for the Court of Special Appeals to affirm, reverse, or vacate, thus rendering the appeal moot.

It is well settled that "[a]ppellate courts do not sit to give opinions on abstract propositions or moot questions, and appeals which present nothing else for decision are dismissed as a matter of course." *State v. Ficker*, 266 Md. 500, 506–07, 295 A.2d 231, 235 (1972) (citations omitted); *See also In re Kaela C.*, 394 Md. 432, 906 A.2d 915 (2006) (citations omitted). We consider a case moot "when there is no longer any existing controversy between the parties at the time that the case is before the court, or when the court can no longer fashion an effective remedy." *In re Kaela C.*, 394 Md. 432, 452, 906 A.2d 915, 927; *In re Karl*, 394 Md. 402, 410, 906 A.2d 898, 902 (2006); *GMC v. Seay*, 388 Md. 341, 365, 879 A.2d 1049, 1063 (2005); *See also Hammen v. Balt. County Police Dep't*, 373 Md. 440, 449, 818 A.2d 1125, 1131 (2003); *Robinson v. Lee*, 317 Md. 371, 375, 564 A.2d 395, 397 (1989) (citations omitted). Consistent with the holdings of those cases, we conclude that the Circuit Court's grant of a new trial eliminated the controversy between the parties, which was the subject of the appeal, such that the mandate of the Court of Special Appeals, as a matter of law, should have read, "appeal dismissed." *Lloyd v. Supervisors of Elections*, 206 Md. 36, 39, 111 A.2d 379, 380 (1954) (noting that appellate courts do "not sit to give opinions on abstract propositions or moot questions, and appeals which present nothing else for decision are dismissed as a matter of course"); *Peterson*, 315 Md. at 82, 553 A.2d at 677 (stating further that " '[g]enerally when a case becomes moot, we order that the appeal or the case be dismissed without expressing our views on the merits of the controversy.' Nevertheless, there is no constitutional prohibition which bars th[e] [appellate] [c]ourt from expressing its views on the merits of a case which becomes moot during appellate proceedings.") (citations omitted). *See also GMC*, 388 Md. at 365, 879 A.2d at 1063 (quoting *Reyes v. Prince George's County*, 281 Md. 279, 380 A.2d 12 (1977)); *Bishop v. Governor of Maryland*, 281 Md. 521, 524–25, 380 A.2d 220, 223 (1977) (citations omitted).

The State points to a public policy benefit served by reported judicial decisions. The State's point is well taken. There

is a public benefit derived from published opinions, which is the reason appellate courts are sometimes "willing to decide moot questions where 'it appears . . . that there are important issues of public interest raised which merit an expression of our views for the guidance of courts and litigants in the future.' " *Robinson*, 317 Md. at 376, 564 A.2d at 397 (citing *In re Special Investigation No. 281*, 299 Md. 181, 190, 473 A.2d 1, 5 (1984)). *See also Hammen*, 373 Md. at 450, 818 A.2d at 1131 (explaining that this Court generally dismisses moot actions without a decision on the merits but that we retain the constitutional authority to express our views on the merits of a moot action in some circumstances). While we have, on prior occasions, discussed our view on the merits of moot questions when such discussions were important to the case at issue or future cases, we nonetheless dismissed those appeals pursuant to our mandate, as the mandate represents the judgment of the Court.[11]

The Court of Special Appeals should have dismissed the appeal and reflected that disposition in its mandate, once it learned that the Circuit Court had granted Petitioner a new trial.[12] For example, in *Peterson*, we granted *certiorari* to decide whether the Court of Special Appeals had misapplied Maryland Rule 4–346(c), which provides that a revocation of probation hearing " 'shall be held before the sentencing judge, whenever practicable.' " *Peterson*, 315 Md. at 76, 553 A.2d at

---

11. *See supra* footnote 1, providing the language of Maryland Rule 8–606, which states, in part, that the mandate "shall constitute the judgment of the Court."

12. We note that the Court of Special Appeals had not yet issued its mandate when Petitioner requested that the court vacate its opinion and dismiss the appeal. According to Maryland Rule 8–606(a), a mandate certified by the clerk of the court constitutes the judgment of the court. The Court of Special Appeals did not enter its formal mandate, however, until December 15, 2005, more than six weeks after Petitioner requested that the court withdraw its opinion and dismiss the appeal. That the Court of Special Appeals had not yet issued its mandate when Petitioner requested that the court withdraw its opinion, provides further support for our conclusion that the judgment of the Court of Special Appeals should have read something like "appeal dismissed as moot due to grant of new trial while appeal was pending."

674. Peterson violated his probation and had a probation revocation hearing conducted by a judge who was not the sentencing judge, despite the objections of Peterson's counsel. The Court of Special Appeals held that the judge who presided over the violation of probation hearing violated Rule 4–346(c) because he made no findings as to the practicality of having the sentencing judge preside over the proceedings. The State filed a petition for writ of certiorari, which we granted. Despite the issuance of the writ of certiorari, another probation revocation hearing was held before another judge; however, neither party objected. Upon our review of the case, we determined that it was "clear that the present appellate proceedings ha[d] become moot" because both parties agreed to appear before the non-sentencing judge. *Peterson*, 315 Md. at 79–80, 553 A.2d at 675. We therefore stated that there was " 'no longer an existing controversy between the parties, so there [wa]s no longer any effective remedy which the court c[ould] provide,' " but asserted that "there is no constitutional prohibition which bars this Court from expressing its views on the merits of a case which becomes moot during the appellate proceedings. . . . We will do so, however, 'only in the rare instances which demonstrate the most compelling circumstances.' " *Peterson*, 315 Md. at 79–80, 82, 553 A.2d at 675–76, 677 (citations omitted). We concluded that the circumstances represented "one of those 'rare instances' in which the Court should express its views on the merits of a moot case." *Peterson*, 315 Md. at 82–83, 553 A.2d at 677. As a result, this Court examined Rule 4–346(c) to discern the legislative intent and concluded that "[w]e disapprove of the Court of Special Appeals' construction and application . . . of Rule 4–346(c). If this case were not moot, we would reverse the Court of Special Appeals' judgment. . . ." *Peterson*, 315 Md. at 85, 553 A.2d at 679. In our mandate, we reflected our holding of mootness by vacating the judgment of the Court of Special Appeals with directions to vacate the judgment of the Circuit Court. *Peterson*, 315 Md. at 90, 553 A.2d at 681.

Similarly, in *Chertkov v. State*, 335 Md. 161, 642 A.2d 232 (1994), we examined whether a sentencing court could alter a

sentence, without the consent of both parties, that it had imposed pursuant to a binding plea agreement. We expressly determined that we would first have to address whether the State had a right to appeal the court's modification of sentence and thereafter concluded that it did not have such a right. *Chertkov*, 335 Md. at 166–71, 642 A.2d at 235–37. Nonetheless, we stated that "[o]rdinarily our decision to dismiss the appeal would end our inquiry. When, however, the matter raised, and which we cannot reach because of our ruling on a threshold issue, is one of substantial importance, we will make an exception." *Chertkov*, 335 Md. at 170, 642 A.2d at 237. We therefore expressed our views as to whether a binding plea agreement precludes a trial court from modifying an imposed sentence, and then issued our mandate dismissing the appeal. *Chertkov*, 335 Md. at 171–75, 642 A.2d at 237–39. *See generally Robinson*, 317 Md. 371, 564 A.2d 395 (discussing the issue before the Court to provide guidance for future litigants, even though we acknowledged that it was moot, and remanding the case to the court below with directions to dismiss on grounds of mootness); *Hammen*, 373 Md. 440, 818 A.2d 1125 (2003) (addressing an issue, although moot, on the basis that the issue could reoccur in the future, but then reflecting the issue's moot status in the mandate).

The State argues that the reported opinion responded to a question of first impression in Maryland—whether aiding and abetting is sufficient to convict one of a CDS possessory offense—that is of importance. Based on that, the State maintains, the Court of Special Appeals should not be required to dismiss the appeal. Similar to *Peterson* and *Chertkov*, there is no reason the Court of Special Appeals could not issue an opinion to elucidate the issue and provide guidance for future cases, if it decided that the issue before it was important enough to discuss, even though the issues had become moot. The intermediate appellate court's opinion, however, would, at most, constitute dicta because the court would still have to reflect that the issues were moot, by dismissing the appeal and reflecting that disposition in its mandate. *See, e.g. Lodowski v. State*, 302 Md. 691, 725, 490 A.2d 1228, 1245

(1985) (asserting that "[w]hile what we say in this posture may be characterized as *obiter dicta,* we feel an urgency to speak in the hope of avoiding the burden of further appeals with respect to the issues discussed"). Therefore, even though the intermediate appellate court apparently decided to let stand its published opinion, the mandate would still have to reflect "appeal dismissed" because the issues before the court had become moot as to Cottman's case. By parity of reasoning, the mandate also should have been accompanied by a consistent editorial change in the opinion, at its end, where the unofficial "mandate" appears because it otherwise would be inconsistent with the proper formal mandate.

The State argues further that Petitioner had ample time under the Maryland Rules to dismiss his appeal, but essentially waived his right to dismiss his appeal by waiting for the Court of Special Appeals to file its opinion. Maryland Rule 8–601 states specifically that "[a]n appellant may dismiss an appeal without permission of the Court by filing a notice of dismissal at any time before the filing of the opinion of the Court." According to the State, because the Circuit Court granted Petitioner a new trial on August 18, 2005, he had more than enough time to dismiss his appeal before October 31, 2005, the date when the Court of Special Appeals filed its opinion. The State contends that, instead, Petitioner ignored the timeline provided by the Maryland Rules because he hoped to obtain a favorable result from the Court of Special Appeals, eliminating the need for a new trial. The State maintains that to order withdrawal of the filed opinion would reward Petitioner for seeking to obtain relief simultaneously in two separate courts.[13]

---

**13.** Petitioner could have and, more importantly, should have promptly notified the Court of Special Appeals in writing that his motion for new trial had been granted. Because Petitioner did not comply with Rule 8–601, the intermediate appellate court was not required to withdraw its opinion. Moreover, this Court has no to authority to order that the Court of Special Appeals withdraw its opinion. We reach this conclusion because this Court reviews judgments rather than opinions.

We are in accord with the State that Petitioner should have followed the timeline set forth in the Maryland Rules and timely dismissed his appeal, in accordance with Rule 8–601 (by dismissing without the permission of the court before the appellate court filed its opinion on October 31, 2005). Had he done so, by dismissing his appeal at the latest, by October 31, 2005, instead of on November 4, 2005, further proceedings in the appellate courts would have been unnecessary.[14] Notwithstanding, a party cannot "waive" life into a moot case, because mootness is something that an appellate court may notice on its own, even if no party raises the issue. Because the issues on appeal were moot, the intermediate appellate court could not have issued its mandate affirming or reversing a judgment that no longer existed at the time that it filed its opinion. Given the posture of the case before the Court of Special Appeals, that court could choose to maintain the expression of its views on the novel legal issue raised by leaving its reported opinion "on the books"; however, it did not have authority to affirm or reverse the prior judgment of the Circuit Court.

## CONCLUSION

The Circuit Court retained its fundamental jurisdiction to grant Petitioner a new trial, even though the appeal was pending in the Court of Special Appeals. We hold that the Court of Special Appeals erred, as a matter of law, in denying Petitioner's request to dismiss the appeal after he had been granted a new trial, as the new trial rendered moot the challenge to the judgment of the trial court before the appellate court. Although the Circuit Court granted Petitioner a new trial, the Court of Special Appeals retained the ability to express an opinion on the novel issue in the case; however, the judgment of the intermediate appellate court could not provide an effective remedy as there was no longer an existing

---

14. We note that Rule 8–601 gives the Petitioner the ability to dismiss the appeal *without the permission of the court* at any point before the opinion is filed. It does not prevent the Petitioner from requesting that the court dismiss its appeal, on the grounds of mootness, after the opinion is filed.

controversy between the parties at that time. Therefore, that court's judgment, i.e., its mandate, should have reflected the moot status of the case and directed that the appeal be dismissed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE APPEAL ON THE GROUNDS OF MOOTNESS. BALTIMORE COUNTY TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

RAKER, J., concurs specially and files an opinion in which BELL, C.J., joins.

WILNER, J., concurs in part and dissents in part and files an opinion in which BELL, C.J., joins in part.

RAKER Judge, concurring, in which BELL, C.J., joins:

I join in the majority opinion and in the judgment. My concurring opinion is directed at Judge Wilner's concurring opinion in which he states that, although not an issue for review before this Court, polygraph test results are per se inadmissible, unreliable, and have no evidentiary value. Conc. op. at 755–56, 912 A.2d at 635. Given the movement in the law around the country in both state and federal courts related to the admissibility of polygraph test results since *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), I think it a big mistake to take any position on an issue not properly before us, particularly one that has not been briefed nor argued.

In the federal courts, circuits that do not permit evidence of polygraph results for any purpose are now in the minority. *See, e.g., United States v. Cordoba,* 104 F.3d 225, 228 (9th Cir.1997); *United States v. Posado,* 57 F.3d 428, 434 (5th Cir.1995); *United States v. Piccinonna,* 885 F.2d 1529, 1535–37 (11th Cir.1989); *United States v. Johnson,* 816 F.2d 918, 923 (3rd Cir.1987); *United States v. Mayes,* 512 F.2d 637, 648 n. 6 (6th Cir.1975); *United States v. Infelice,* 506 F.2d 1358,

1365 (7th Cir.1974), cert. denied sub nom., *Garelli v. United States*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802 (1975). Although most states maintain a per se rule excluding polygraph evidence, *see, e.g., State v. Porter*, 241 Conn. 57, 698 A.2d 739, 773 (1997); *In re Odell*, 672 A.2d 457, 459 (R.I.1996) (per curiam); *People v. Gard*, 158 Ill.2d 191, 198 Ill.Dec. 415, 632 N.E.2d 1026, 1032 (1994); *Perkins v. State*, 902 S.W.2d 88, 94–95 (Tex.App.1995), New Mexico Rule of Evidence 11–707 makes polygraph evidence admissible generally without the prior stipulation of the parties and without significant restriction. The Supreme Court noted, in *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), as follows:

> "[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques. 1 D. Faigman, D. Kaye, M. Saks, & J. Sanders, Modern Scientific Evidence 565, n. †, § 14–2.0, and § 14–7.0 (1997); see also 1 P. Giannelli & E. Imwinkelried, Scientific Evidence § 8–2(C), pp. 225–227 (2d ed. 1993) (hereinafter Giannelli & Imwinkelried); 1 J. Strong, McCormick on Evidence § 206, p. 909 (4th ed. 1992) (hereinafter McCormick). Some studies have concluded that polygraph tests overall are accurate and reliable. See, *e.g.*, S. Abrams, The Complete Polygraph Handbook 190–191 (1989) (reporting the overall accuracy rate from laboratory studies involving the common 'control question technique' polygraph to be 'in the range of 87 percent'). Others have found that polygraph tests assess truthfulness significantly less accurately—that scientific field studies suggest the accuracy rate of the 'control question technique' polygraph is 'little better than could be obtained by the toss of a coin,' that is, 50 percent. See Iacono & Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific Evidence, *supra*, § 14–5.3, at 629 (hereinafter Iacono & Lykken)."

*Scheffer*, 523 U.S. at 309–10, 118 S.Ct. at 1265, 140 L.Ed.2d 413.

My point in writing this concurring opinion is not that polygraph tests *are* in fact reliable, or that they should be admitted into evidence, or be admissible for other purposes other than at trial. I have no idea, without an adequate record and a review of the literature and studies, how I would come out on the issue. I believe simply that whether polygraph techniques have made sufficient technological advances since *Kelley v. State*, 288 Md. 298, 418 A.2d 217 (1980), the seminal case on admissibility of polygraphs in Maryland, and *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), the test in Maryland for admissibility of novel or scientific evidence, cannot be decided without a fully developed record below, with briefs and arguments in this Court. This case is not the one to reiterate a per se rule of inadmissibility, and certainly not the case to tell trial judges to *never, never, never* consider polygraph tests in exercising their discretion as to whether to grant a new trial. The issue is simply not before us.

Chief Judge BELL has authorized me to state that he joins in this concurring opinion.

WILNER, Judge, concurring in part and dissenting in part which BELL, C.J., joins in Part A only:

## A.

I join in the judgment and agree entirely with the Court's holdings that (1) the Circuit Court retained jurisdiction to consider and grant Cottman's motion for new trial, notwithstanding the pendency of the appeal, and (2) upon the granting of that motion, the Court of Special Appeals lost jurisdiction over the appeal and had no choice but to dismiss it once informed that the new trial had been granted. I disagree, however, with the Court's conclusion that it was not also incumbent on the appellate court to withdraw its opinion. It is true that, on rare occasions, an appellate court may consider and opine on an issue that is technically moot—where the issue is an especially important one and (1) the issue is likely to recur but because of the posture in which it is likely to recur, will usually be moot by the time it reaches an appellate

court, or (2) for some other reason, appellate guidance is required. This case meets none of those criteria.

When the Circuit Court granted Cottman's motion for new trial, it effectively eradicated the judgment from which the appeal was taken. The case was moot, not just because there was no effective relief that the Court of Special Appeals could grant, which is the traditional definition of mootness, but, beyond that, because there ceased to be anything for the appellate court to review. No judgment was left. It was as if the new trial had been granted before the appeal was noted or the appeal had been affirmatively dismissed before the opinion was filed. There was no important issue addressed in the opinion that was likely to recur in an equally non-appealable context and none upon which guidance from the Court of Special Appeals was necessary. The Court's opinion had no more precedential value than a law review article. It simply recited the court's view regarding a judgment that no longer existed. That does nothing to enhance the common law, but, rather, detracts from it. I would hold that, upon being informed of the grant of the new trial, the court was obliged not only to dismiss the appeal but to withdraw its opinion as well, and that it abused its discretion in refusing to do so.

## B.

I write separately also to comment on the granting of the new trial. I agree that the trial court had *jurisdiction* to do what it did, and, although I realize that the *correctness* of its action is not before us for review, and therefore is inappropriate for consideration by the Court in resolving this appeal, there are two points that I think worthy of note that are properly the subject of a concurring opinion. The first is the apparent anomaly of providing that relief under the circumstances of this case. The case was tried non-jury and rested almost entirely on the judge's assessment of the credibility of Detective Moore, the State's only witness. Moore testified that, on August 14, 2002, Cottman and a female accomplice sold him a bag of cocaine. His testimony was very precise, and he identified Cottman, both later at the scene when

uniformed officers, summoned by Moore, arrested Cottman, and in court. Cottman, who, in an unsuccessful attempt to obtain a postponement of trial, claimed an alibi defense, did not testify and offered no evidence. In announcing his verdict of guilty, the judge stated that he found Detective Moore's testimony to be "very credible."

Had the judge not found Moore's testimony to be credible, he could not lawfully have convicted Cottman, for, although the drugs purchased by Moore were placed into evidence, there was no corroborating evidence of criminal agency. Yet, the court, having made that credibility determination and having sentenced Cottman to ten years in prison, offered to consider granting him a new trial if he passed a polygraph examination administered by someone trained by either the FBI or the Army Security Agency. Cottman passed a polygraph examination administered by someone *not* trained by the FBI or the Army Security Agency, but the judge, based on an *ex parte* assurance from one of his colleagues that the agent was qualified, granted Cottman a new trial nonetheless.

What strikes me anomalous about this is that, if the function of the polygraph examination was in some way to diminish Detective Moore's credibility by showing that Cottman was not the person who sold him the cocaine—*i.e.*, to support the alibi defense for which he offered no evidence at trial—and the judge accepted the result for that purpose, which would be its only relevance, the remedy should not have been a new trial, but an acquittal, for there would then, necessarily, be a reasonable doubt as to Cottman's guilt. The very doubt, or uncertainty, that impelled the judge to grant a new trial Constitutionally required that Cottman be acquitted. What would be left to retry?

This is just one illustration of why trial courts ought not be granting motions for new trial or making other pivotal judicial decisions based on the results of a polygraph examination. This Court has made clear, on numerous occasions, that polygraph test results are inadmissible, not because of some technical rule of evidence, but because they are unreliable.

*See Kelley v. State,* 288 Md. 298, 302, 418 A.2d 217, 219 (1980); *Johnson v. State,* 303 Md. 487, 513, 495 A.2d 1, 14 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Bohnert v. State,* 312 Md. 266, 278, 539 A.2d 657, 663 (1988); *State v. Hawkins,* 326 Md. 270, 275, 604 A.2d 489, 492 (1992); *Patrick v. State,* 329 Md. 24, 30, 617 A.2d 215, 218 (1992). In *Hawkins,* we iterated that "[t]he reliability of such tests has not been established to our satisfaction," and that "[i]n our system of criminal justice, the trier of fact is the lie detector, and we have been steadfast in disallowing that function to be usurped by a process we have not found to be trustworthy." 326 Md. at 275, 604 A.2d at 492. Whatever their use may be for police investigation purposes or even for prosecutorial decisions, they have no evidentiary value in court.

Polygraph results are inadmissible whether offered by the State or the defendant. They cannot be used to help or hurt a defendant's case precisely because they are untrustworthy and have no evidentiary value. It is wholly impermissible, I believe, for judges to use evidence that this Court has found, as a fact and as a matter of law, to be untrustworthy and unreliable, in making judicial decisions, even discretionary ones. If the issue had been before us, I would unhesitatingly have held that the granting of the new trial in this case was an abuse of discretion, which it was. The problem is that there is nothing, decisionally, that we can do about it.

In her concurring opinion, Judge Raker cites several Federal decisions for the proposition that "circuits that do not permit evidence of polygraph results for any purpose are now in the minority" and suggests that in light of that supposed shift in thinking about polygraph evidence, it is inappropriate to tell Maryland judges to *"never, never, never* consider polygraph tests in exercising their discretion as to whether to grant a new trial."

I have several responses. The first is that my reading of the cases cited by Judge Raker does not reveal any such shift. In *United States v. Cordoba,* 104 F.3d 225 (9th Cir.1997), the court did not hold that polygraph results were admissible.

Quite the contrary. The court pointed out that its firm hostility to polygraph evidence had led it, in conformance with *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), to hold that such evidence was *per se* inadmissible, but that the *Frye* standard had been overruled, with respect to Federal court proceedings, by *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The District Court, following the Ninth Circuit precedent, had excluded polygraph evidence offered by Cordoba as *per se* inadmissible, and the appellate court vacated the judgment and remanded the case for the trial court to review the evidence under the *Daubert* standard. The Ninth Circuit court made very clear, however, that "[w]ith this holding, we are not expressing new enthusiasm for admission of unstipulated polygraph evidence" because "[t]he inherent problematic nature of such evidence remains." *United States v. Cordoba, supra,* 104 F.3d at 228. It agreed with the comment of the Fifth Circuit court in *United States v. Posado,* 57 F.3d 428, 434 (5th Cir.1995), that "[w]e do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case."

Not only is that decision the antithesis of an endorsement of polygraph evidence, but more so is what occurred following the remand. After a two-day hearing, the District Court found that the evidence was inadmissible under *Daubert*—that (1) although capable of testing and subject to peer review, no reliable error rate conclusions were available for real-life polygraph testing, (2) there was no general acceptance of it in the scientific community for courtroom fact-determinative purposes, (3) there were no reliable and accepted standards, and (4) without such standards, there was no way to ensure proper protocols to measure reliability. The Ninth Circuit Court affirmed that decision. *United States v. Cordoba,* 194 F.3d 1053 (9th Cir.1999). In doing so, it commented that "[a] major reason why scientific debate over polygraph validity yields conflicting conclusions is that the validity of such a complex procedure is difficult to assess and may vary widely from one application to another." *Id.* at 1059. It also expressly con-

firmed the District Court's conclusion that "the relevant scientific community did not generally accept polygraph exams as being sufficiently reliable to be used as evidence in a trial." *Id.* at 1061.

The other Federal cases cited by Judge Raker antedated *Daubert.* Whether those courts now follow the approach of the Fifth and Ninth Circuits and subject polygraph evidence to a *Daubert* analysis is unclear. At the very least, the pre-*Daubert* cases, absent some further inquiry, are suspect.

My second response is that any determination by the Federal courts that polygraph evidence may be admissible under a *Daubert* analysis is quite irrelevant. Only seven months ago, in *Clemons v. State,* 392 Md. 339, 896 A.2d 1059 (2006), this Court unanimously maintained its allegiance to the *Frye* test, as it had done four years earlier in *Wilson v. State,* 370 Md. 191, 803 A.2d 1034 (2002).

Finally, even if one day—some day—this Court, either by adopting the *Daubert* approach or by reversing our earlier cases and holding that polygraph evidence satisfies the *Frye* test, should conclude that such evidence is admissible, that day is not yet upon us. Were the issue before us now, absent any dramatic shift within the scientific community in the last six years, we presumably would be influenced in applying the *Frye* test by the statement of the Supreme Court in *United States v. Scheffer,* 523 U.S. 303, 309, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413, 419 (1998), that "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." That statement, by the way, was made in support of a holding that Military Rule of Evidence 707, which made polygraph evidence *per se* inadmissible, served legitimate interests in the criminal justice process and did not unconstitutionally preclude the defendant from offering evidence in his defense.

So I adhere to the view that, until such time as this Court chooses to reverse itself and hold that polygraph evidence is reliable and admissible, trial judges should, in Judge Raker's

words, *"never, never, never* consider polygraph tests in exercising their discretion as to whether to grant a new trial." They should no more base judicial decisions on polygraph results than on a reading of the runes or astrological charts. Given what occurred here, with great respect for Judge Raker's view, I think this is precisely the case to make that point, at least in a concurring opinion.

Chief Judge BELL joins in Part A only of this opinion.